**N. H. NEWMAN, and others, Plaintiffs,**

v.

**STATE OF ALABAMA et al., Defendants, United States of America, Amicus Curiae.**

**Civ. A. No. 3501-N.**

United States District Court, M. D. Alabama, N. D.

Oct. 4, 1972.

---

Joseph D. Phelps, of Hill, Robison, Belser, Brewer & Phelps, Montgomery, Ala., for plaintiffs.

William J. Baxley, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., State of Ala., Montgomery, Ala., for defendants.

David L. Norman, Asst. Atty. Gen., and Louis M. Thrasher, Patricia G. Littlefield and Philip Fuoco, Attys., Civil Rights Div., Dept. of Justice, Washington, D. C., and Ira DeMent, U. S. Atty., M. D. Ala., Montgomery, Ala., for the United States as amicus curiae.

## OPINION

JOHNSON, Chief Judge.

This is a class action brought by prisoners within the Alabama Penal System who represent themselves and others similarly situated. Plaintiffs contend that as prisoners they are deprived of proper and adequate medical treatment in violation of their rights guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution. They seek declaratory and injunctive relief. Defendants are the Attorney General of the State of Alabama, the Commissioner, the chairman, and other members of the Alabama Board of Corrections, and the warden, the hospital administrator and the hospital staff of the Medical and Diagnostic Center, Mt. Meigs, Alabama, the general hospital for the Alabama prison system. The case is now submitted upon the pleadings, motions, depositions, testimony taken at trial, and briefs of the parties. Jurisdiction is founded upon 28 U.S.C. § 1343.

As this Court has stated before, it is well established that prisoners do not lose all their constitutional rights. Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L. Ed.2d 1212 (1968). See Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (March 20, 1972). Among other safeguards, the Eighth Amendment's prohibition against cruel and unusual punishment, incorporated into the due process clause of the Fourteenth Amendment, protects prisoners from unconstitutional conditions of treatment imposed by prison authorities under color of state law. See Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The adequacy of medical treatment provided prison inmates is a condition subject to Eighth Amendment scrutiny. See, e. g., Hutchens v. State of Alabama, 466 F.2d 507 (5th Cir. August 15, 1972); Campbell v. Beto, 460 F.2d 765 (5th Cir., April 18, 1972). While federal courts will not hesitate to intervene when action is clearly necessary to protect a prisoner's constitutional rights, the courts traditionally have been reluctant to interfere in the normal processes of state prison administration. Consistent with this policy, the Fifth Circuit has narrowly limited the scope of review under the Eighth Amendment. Courts should not inquire into the adequacy or sufficiency of medical care of state prison inmates unless there appears to be an abuse of the broad discretion which prison officials possess in this area. See, e. g., Haskew v. Wainwright, 429 F.2d 525 (5th Cir. 1970); Roy v. Wainwright, 418 F.2d 231 (5th Cir. 1969); Granville v. Hunt, 411 F.2d 9 (5th Cir. 1969); Thompson v. Blackwell, 374 F.2d 945 (5th Cir. 1967). The Fifth Circuit has repeatedly stated, however, that there may be cases in which the deprivation of medical care will warrant judicial inquiry and action. See, e. g., Woolsey v. Beto, 450 F.2d 321 (5th Cir. 1971); Sanders v. United States, 438 F.2d 918 (5th Cir. 1971); Schack v.

Florida, 391 F.2d 593 (5th Cir. 1968). *See also,* Burroughs v. Wainwright, 464 F.2d 1027 (5th Cir., July 28, 1972); Bowman v. Hale, 464 F.2d 1032 (5th Cir., July 28, 1972). When practices within a prison system result in the deprivation of basic elements of adequate medical treatment, then such practices violate constitutional guarantees and federal courts must act to provide relief. This is especially true when deprivation immediately threatens life and limb. Campbell v. Beto, *supra.*

Plaintiffs in this case have shown by substantial evidence that the Alabama prison authorities have clearly abused their discretion in providing medical treatment to inmates. Defendants, in administering the Medical and Diagnostic Center (M&DC) and other prison medical facilities, and in otherwise performing the duty of providing for the medical needs of inmates, have fallen far short of supplying the constitutionally required level of adequate medical treatment. The medical facilities of the Alabama prison system are grossly understaffed. In addition, with the exception of the M&DC, which is recently built and generally well equipped, the physical plant and equipment provided for the care of prisoners are totally inadequate. Compounding the lack of staff and facilities, and resulting in part therefrom, is the poor administration of the medical treatment program, including the procurement and distribution of drugs and other medical supplies. Further, the record is filled with examples of correctional staff members intentionally denying inmates the right to be examined and treated by trained medical personnel, and further refusing to provide medicine and other treatment prescribed by a physician. The result is a degree of neglect of basic medical needs of prisoners that could justly be called "barbarous" and "shocking to the conscience." *See,* Novak v. Beto, 453 F.2d 661, 671 (5th Cir. 1971).

The almost 4000 prisoners within the Alabama Penal System are housed in five major prisons—Atmore, Holman (maximum security unit), Draper, Tutwiler (women) and the M&DC—a minimum security facility for the young, an honor farm, a pre-release center, and 13 road camps. M&DC, where the prison general hospital is located, also serves as the receiving center for approximately 175 new inmates each month as well as the permanent assignment for some 175 inmates. The hospital, whose main ward is frequently filled nearly to capacity, contains approximately 80 beds, including a tuberculosis ward and a hepatitis ward. At any given time, some 100 additional inmates will be temporarily assigned to the center from other facilities, awaiting diagnosis or treatment by a physician, or receiving treatment on an outpatient basis.

The medical staff at M&DC, in addition to providing treatment for hospital patients, must attend to the medical needs of the inmates permanently and temporarily assigned to the center. This includes the routine physical examination of all new prisoners. To provide this care, there is no full-time physician presently employed at M&DC. Services are provided by three doctors in private practice who are employed on a salary basis to work at the center for a short time each week. Services are also provided on a part-time basis by the Medical Director of the prison system who, in addition, has responsibility for the entire medical care program within the system and further maintains his own very extensive private practice. Three registered nurses, the only ones employed anywhere in the system, cover the hospital on staggered shifts during the week. There is no registered nurse on duty at night or on weekends. While nurses and doctors can be called if needed, it often takes several hours to locate them, and at least one doctor refuses to take night calls.

Most of the daily care at the M&DC is provided by nine medical technical assistants (MTA's) who received their training as medics in the armed services and who perform as licensed practical nurses, although not licensed by the

state. They are responsible for providing 24-hour coverage, seven days a week. At night, and frequently during the day, only one MTA is on duty to serve the entire center. A dentist provides services to inmates during part of the day, three days a week. The M&DC has no hospital administrator, no dietician, no registered X-ray technician, no medical records librarian and no civilian records clerk.[1]

The record is clear, from the testimony of outside experts, of physicians who have attended patients at the M&DC, and of others, that the present level of staffing at the Center is simply insufficient to provide even minimally adequate care to inmates. The case histories of inmates, described below, attest graphically to this conclusion.

The totally inadequate medical care at the M&DC is remarkably good compared with that available in other prisons within the system. The Atmore-Holman complex, located some 150 miles from the M&DC, contains approximately 1700 inmates, or almost half the state prison population. Only one part-time, retired physician is employed to treat these inmates. He conducts sick call at both Atmore and Holman for a few hours, three times a week. The evidence shows that at Atmore alone as many as 150 inmates may attend sick call on a single day. Of these, only a handful can be selected to see the doctor that day. If the regular physician becomes ill or is otherwise unable to treat the inmates, the chances of obtaining even emergency treatment are even less, since a week or more sometimes passes during which no doctor visits either prison. Dental care at Holman and Atmore is provided by one part-time dentist.

Both Atmore and Holman maintain small, overcrowded infirmaries with only rudimentary laboratory facilities. Atmore has an old X-ray machine, not recently tested for leakage, operated by an unsupervised inmate. The minor surgery room is poorly equipped (there is no sterilizer for example) and unsanitary. Neither Holman nor Atmore has means to safely restrain patients or to isolate contagious diseases. Holman has no oxygen unit and otherwise lacks equipment necessary for emergencies. The only full-time medical personnel employed to staff these facilities are MTA's, two at Atmore and three at Holman, although the budget includes slots for five MTA's at each prison—slots which were requested and justified by the Board of Corrections as being essential to provide minimal care to inmates.

Draper prison, where approximately 850 inmates are assigned, has no full-time physician. The Medical Director, in addition to his private practice and numerous other duties already described, conducts sick call five mornings a week. A dentist is available only one-half day per week. Again, although budgeted slots have been approved for five MTA's, only one is employed to maintain the small infirmary at Draper and otherwise care for the inmates.[2] The medical staff at Tutwiler, which houses 120 women prisoners, likewise consists of only one MTA. A physician conducts sick call five times a week. While the more serious illnesses or injuries are treated outside the prison, either at the doctor's office or at a private hospital, an average of seven or eight babies are delivered at Tutwiler each year under conditions which endanger the lives of both mother and infant. The delivery table has no restraints, paint is peeling from the ceiling above it, and large segments of the linoleum floor around the table are missing. There are no facilities to resuscitate the newborn or otherwise

---

1. A pharmacist was recently employed to work full time at the center. Prior to his employment, responsibility for procuring and maintaining the drug supply was divided among several employees at the M & DC.

2. When this case went to trial, there were plans to transfer a member of the correctional staff who had some medical training to the medical staff as an MTA.

provide adequate care should any complications arise during delivery.

There are no medical personnel assigned to any of the remaining prison facilities which together house more than 800 prisoners.[3] If an inmate becomes ill or is injured, he is supposed to be taken to a local physician, who is paid on a contract basis, or to the M&DC. In practice, however, the wardens of these facilities, because of the inconvenience and because they are not trained to screen medical complaints, many times refuse to provide needed medical attention. If an inmate does see a doctor, it is frequently impossible in these small, outlying prison facilities to obtain prescribed medicine or other treatment.

The effects of inadequate facilities and an overworked staff appear throughout the system. Medical organization is informal and ineffective. For example, at the M&DC there are no hospital bylaws, and no regular staff meetings or medical committee meetings. The duties and responsibilities of medical personnel are not set out in writing. Consequently, lines of supervision are vague. Untrained inmates provide many of the support services as janitors, ward attendants, records clerks, and X-ray, laboratory and dental technicians, yet few checks are made to see that they properly complete their tasks. As a result, patients are neglected and doctors' orders are rarely carried out. There is no standard sanitary procedure followed in the hospital or the infirmaries, and there is no fire or disaster plan for evacuation of any of the facilities. Moreover, no one, inside or outside the prison system, conducts periodic health inspections, fire and safety inspections, or audits to check the quality of care being provided. It is no surprise, therefore, that hazardous and substandard conditions, ranging from improperly stored oxygen to unsanitary kitchen facilities, are found throughout the system.

Medical records, including those within the hospital, are not standardized, are inaccurate and incomplete. Strict control of narcotics is thereby hampered, leading to drug abuse. In addition, because of poor records it is frequently impossible for medical personnel at outlying prisons to tell what treatment, if any, a patient returning from the M&DC has received and what course is indicated for his future care. Further, records of inmates are sometimes lost or misplaced. This is especially true of medication cards for outpatients, without which prescribed medication cannot be administered.

There is a chronic shortage of medical supplies throughout the system. Not only are prescription drugs frequently unavailable, especially those for relieving pain, but simple items such as aspirin and antacids have been lacking in some prisons for weeks at a time. Rags have been used as a substitute for gauze sponges, out-of-date drugs have been administered, and oxygen tanks in a prison ambulance have remained empty and unusable for more than a month. Patients must routinely wait months, and on occasion more than a year, to be fitted with prosthetic devices and eye glasses.

Because the medical facilities are understaffed, medical personnel are continually called upon to perform services for which they have not been trained and for which they are not qualified. While this occurs among the civilian staff, the worst abuse is found among inmate personnel. Unsupervised prisoners, without formal training, regularly pull teeth, screen sick call patients, dispense as well as administer medication, including dangerous drugs, give injections, take X-rays, suture, and perform minor surgery.

The cumulative effect of the above-described deficiencies on the quality of care provided inmates is profound. An inmate whose condition, while not an emergency, is serious enough to warrant

3. The physician employed for Tutwiler does provide some services to the youth center.

284

care by a physician may be diagnosed and treated entirely by other inmates who have had no special training, or by an MTA, whose training is limited. Those prisoners who eventually see a doctor may have waited weeks and sometimes months for an appointment. Inmates examined at infirmaries often must be transferred to the better equipped M&DC for further diagnosis and treatment. Although an immediate request is made, approval for this transfer can take anywhere from a few days (emergencies can be sent immediately) to well over a month. Patients arriving at the M&DC from Holman and Atmore are routinely placed in lockup, even though they were previously in general population. Lockup is segregated confinement in a small two-man cell which the prisoner is allowed to leave, briefly, only once each day. Inmates may remain there a few days, a few weeks or even months before they are taken to sick call or allowed to see a doctor. Some are returned to Atmore or Holman never having been examined by any member of the medical staff at the M&DC. Such delay in providing care has brought needless and untold suffering to countless inmates. Serious diseases are advanced beyond repair before they have been diagnosed and treatment has begun. The result is frequently permanent injury and even death.

If an inmate is cared for by a physician, the physician frequently does not have time to give more than cursory attention to the patient's medical needs. If medicine or other treatment, such as a special diet, is prescribed on an outpatient basis, an inmate may never receive it, or at best receive it sporadically. Compliance with doctors' orders within the hospital is similarly lacking. Medicine is not administered on schedule, bandages are not changed, and there is a general lack of personal care to the point that worsening conditions of patients go unnoticed and unattended.

Perhaps the most deplorable deprivation is that which is the product of the knowing and intentional mistreatment of sick and injured inmates. Inmates held in lockup at the M&DC, sent there for the purpose of treatment, are arbitrarily denied by correctional staff the right even to attend sick call. At the M&DC and elsewhere, correctional personnel, well knowing that an inmate has been prescribed medicine which he is entitled to receive, deliberately refuse it.

The fate of those many prisoners who are mentally ill or retarded deserves special mention. Mental illness and mental retardation are the most prevalent medical problems in the Alabama prison system. It is estimated that approximately 10 percent of the inmates are psychotic and another 60 percent are disturbed enough to require treatment. To diagnose and treat these almost 2400 inmates, the Board of Corrections employs one clinical psychologist, who works one afternoon each week at the M&DC. There are no psychiatrists, social workers, or counsellors on the staff.[4] Severe, and sometimes dangerous, psychotics are regularly placed in the general population. If they become violent, they are removed to lockup cells which are not equipped with restraints or padding and where they are unattended. While some do obtain interviews with qualified medical personnel and a few are eventually transferred for treatment to a state mental hospital,[5] the large majority of mentally disturbed prisoners receive no treatment whatsoever. It is tautological that such care is constitutionally inadequate. See Flint v. Wainwright, 433 F. 2d 961 (5th Cir. 1970).

Several individual cases will illustrate the pervasive and gross neglect of prisoners' medical needs which prevails

4. At least one psychiatrist is employed on a contract basis to diagnose a limited number of the worst cases.

5. The inadequacy of the treatment available at the mental hospitals within the state was the subject of this Court's opinion in Wyatt v. Stickney, 325 F. Supp. 781 (1971), and subsequent orders in that case, 344 F.Supp. 373, 344 F. Supp. 387 (1972).

within the Alabama Penal System. A nineteen-year-old epileptic inmate assigned to the Holman unit tried unsuccessfully for several weeks to obtain medical treatment. An untrained and unsupervised inmate on the medical staff took his blood pressure and temperature and, finding neither abnormal, refused to allow him to see the doctor. When he was finally admitted to the infirmary at Holman, he was immediately placed in an ambulance and sent to the M&DC as an emergency.[6] He arrived at the M&DC on a Thursday, but did not see a doctor until Friday. The preliminary diagnosis was pneumonia, and intravenous antibiotics were begun. The patient, however, his reason and control impaired by a high fever, refused to stay in bed. No medical restraints could be found, and he was finally handcuffed to the bed by the attending MTA. Subsequently, the business manager of the hospital, who had no medical training, ordered the handcuffs removed, and from then until his death on Sunday the inmate was allowed to leave his bed and take cold showers at will. When he died, the only person in attendance was another inmate who shared the room.

A quadriplegic, who spent many months in the hospital at the M&DC, suffered from bedsores which had developed into open wounds because of lack of care and which eventually became infested with maggots. Days would pass without his bandages being changed, until the stench pervaded the entire ward. The records show that in the month before his death, he was bathed and his dressings were changed only once. Equally neglected was another patient at the M&DC who could not eat. Although intravenous feeding was ordered, it was not administered, and no other form of nourishment was received for the three days prior to his death.

Another hospital patient, a geriatric who had suffered a stroke and was partially incontinent, was made to sit day after day on a wooden bench beside his bed so that the bed would be kept clean. He frequently fell from the bench, and his legs became blue and swollen. One leg was later amputated, and he died the following day.

Emergency care is sometimes undeserving of the name. One inmate, severely injured in a stabbing incident, was transported from Atmore prison to a private hospital in the city of Atmore, and finally to the M&DC which had been notified to expect his arrival. No doctor was there to attend him, however, and after waiting for more than an hour, he was transported again to a private hospital where he was operated on some six hours after being wounded. Another inmate was sent to the M&DC by ambulance from Holman as an emergency. Two days passed before he was seen by a physician. He died a few hours later of lung cancer, as the autopsy subsequently revealed.

A number of inmates each year are severely injured while performing jobs for the state. The record documents several instances in which these inmates have been denied surgery which, although expensive, is necessary to restore the use of arms or legs, or otherwise return the patient to good health.

While this list is far from exhaustive, it accurately reflects the scope and extent of the deficiencies in medical treatment which exist in the Alabama correctional system. These case histories do not show isolated instances of mere negligence or malpractice on the part of prison employees. Rather they illustrate what can and does occur when too few reasonable men, functioning with too little supportive facilities, undertake what is, in effect, an impossible task.

■ It is the holding of this Court that failure of the Board of Corrections to provide sufficient medical facilities and staff to afford inmates basic elements of adequate medical care consti-

6. Normally inmates requiring treatment are transferred to the M & DC on a bus which makes regularly scheduled trips.

tutes a willful and intentional violation of the rights of prisoners guaranteed under the Eighth and Fourteenth Amendments. Further, the intentional refusal by correctional officers to allow inmates access to medical personnel and to provide prescribed medicines and other treatment is cruel and unusual punishment in violation of the Constitution.

 When plaintiffs as a class, representing all prisoners in the Alabama Penal System, filed this action pursuant to Rule 23, Federal Rules of Civil Procedure, seeking declaratory and injunctive relief and when, in response to a show cause order of this Court, the defendants in a formal answer to the complaint categorically denied the plaintiffs' contentions, it was determined that the plaintiffs were entitled to be represented by competent legal counsel in this proceeding. Accordingly, the Honorable Joseph D. Phelps, Attorney at Law, Montgomery, Alabama, was appointed to represent plaintiffs in this case and in the order of appointment the defendants were put on notice "that a reasonable attorney's fee, to be determined by the Court at the conclusion of this cause", was to be taxed as a part of the court costs in this proceeding. This action is a classic one requiring the granting of an attorney's fee. Here an attorney's fee is to be awarded because of the positive benefit resulting to the plaintiffs and the members of plaintiffs' class. In this connection see Newman v. Piggy Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Miller v. Amusement Enterprises, 426 F.2d 534 (5th Cir. 1970); Lee v. Southern Home Sites Corporation, 444 F.2d 143 (5th Cir. 1971) and Callahan, et al. v. Wallace as Governor of Alabama, etc., et al., 466 F.2d 59 (5th Cir., September 11, 1972). These cases clearly require an award of attorneys' fees since, by pursuing a private remedy in this Court, plaintiffs clearly have benefited substantially a large class of others in the same manner as they have benefited themselves. The evidence in this case reflects that the actual time spent by plaintiffs' attorney in the investigation, preparation, trial, and briefing was approximately 400 hours. Additionally, plaintiffs' attorney actually expended from his own funds for deposition expenses, marshal's services and photostating of records, the sum of $2,483.42. It appears that these expenditures were reasonably necessary to the proper investigation and preparation of this case. It further appears that the sum of $12,000 is a reasonable fee to be awarded the Honorable Joseph D. Phelps for the services rendered plaintiffs and the members of their class. Reimbursement of his actual expenditures will be in addition thereto.

An appropriate order will be entered accordingly.

## DECREE

Pursuant to the findings of fact and conclusions of law made and entered in an opinion of this Court filed this date, it is ordered, adjudged and decreed that the defendants, their agents, successors in office, and all persons acting in concert or in participation with them be and they are hereby enjoined:

1. From refusing or failing to provide adequate medical care to each inmate of the correctional system operated pursuant to the authority of the Alabama Board of Corrections, including but not limited to all inmates of all prisons, road camps and medical centers.

2. From failing to bring the general hospital at the Medical and Diagnostic Center up to the standards provided in the United States Department of Health, Education and Welfare Proposed Revised Regulations for Participation of Hospitals in Medicare Program of January 17, 1972.

3. From failing to comply in every respect with applicable regulations of

the Federal Bureau of Narcotics and Dangerous Drugs and to limit access to all drugs to physicians, registered nurses and non-inmate medical technical assistants on a physician's orders. No unqualified personnel shall prescribe, dispense, or administer prescription drugs.

4. From failing to establish within 90 days from the date of this decree an emergency evacuation plan for each medical facility, including written instructions to employees and periodic fire drills, said plan to be approved by the Alabama Fire Marshal.

5. From failing to provide that the Alabama Fire Marshal conduct regular and periodic inspections of all medical facilities and to comply with any recommendations made by the Fire Marshal pursuant to these inspections.

6. From failing to ensure that each medical facility shall have written sanitation procedures approved by the medical director.

7. From failing to arrange with and provide for the Alabama State Board of Health to make regular and periodic inspection for general sanitation in all medical facilities operated by defendants; this inspection is to include but not be limited to all food processing facilities.

8. From failing to develop a plan within 90 days of this decree setting forth in detail the type and extent of care which is to be provided in each infirmary facility and, in conjunction with this, instituting a systematic program of evaluating and updating all medical equipment at these facilities so as to ensure that each facility has the equipment necessary to provide the type of care set forth in the plan. Within 90 days of this decree the defendants shall file a report with this Court reflecting the status of all equipment and the steps being taken to correct the inadequacies.

9. From failing to conduct a survey of the entire correctional system operated by defendants within 90 days from the date of this decree and to file with this Court within said 90 days proposed minimum staffing for each of the medical facilities operated by the defendants, this survey and staffing proposal to include but not be limited to physicians, psychiatrists, psychologists, medical technical assistants, statewide officers such as directors and assistant directors, dentists, pharmacists, registered nurses, x-ray technicians, hospital administrators and physician consultants.

10. From failing to ensure that every inmate who is in need of medical attention, either for diagnostic or treatment purposes, is seen by a qualified medical attendant when required and by a physician when necessary.

11. From failing to provide, or discontinuing, any medication or other reasonable treatment prescribed by a physician unless on the order of a physician.

12. From failing to ensure that each medical facility maintain at all times a medically acceptable minimum level of drugs and supplies.

13. From failing to provide eye glasses and dentures, or other prosthetic devices, within a reasonable time to those inmates who require them.

14. From failing to place geriatric inmates in separate, uncrowded quarters and to ensure that said geriatric inmates are checked periodically by medical personnel.

It is further ordered:

1. That defendants maintain a record system throughout the Alabama Penal System which will ensure that a complete medical record is available for each prisoner at the facility to which the prisoner is currently assigned.

2. That no inmate shall be punished or placed in a situation of greater security because of seeking medical diagnosis or treatment.

3. That defendants provide physical examinations by a physician for all inmates at regular intervals of not more than two years.

4. That the defendants shall provide ambulances or other suitable emergency transportation vehicles at each medical facility and shall maintain a medically

adequate supply of emergency equipment and supplies at each medical facility.

5. That all medical technical assistants employed by the defendants shall as a minimum meet the same standards required of licensed practical nurses in the State of Alabama.

6. That defendants maintain under the supervision of the medical director written job descriptions for each medical staff member, including medical technical assistants and inmates.

7. That defendants cease the practice of using inmates to deliver medical treatment which under the laws of the state only a licensed physician or nurse is permitted to deliver unless such inmates meet the standards required of a licensed professional in the State of Alabama, and that defendants ensure that inmates who provide direct patient care such as bathing and feeding are adequately trained and supervised.

8. That each inmate sent from another institution to the Medical and Diagnostic Center for medical reasons shall be seen on arrival by either a medical technical assistant or a registered nurse and by a physician within 12 hours following his arrival at the Medical and Diagnostic Center. No inmate shall be held in "medical hold" for over a 36-hour period without being seen by a medical technical assistant, a registered nurse, or a physician.

9. That doctors at the referring institutions shall approve all delays in the transfer from those institutions to the Medical and Diagnostic Center.

10. That the medical director shall develop a program of continual evaluation for all facilities, including personnel, and periodic inspections of all medical facilities to ensure that the standards required by this decree are being met and that medically adequate care is being provided to all inmates. A system of reporting shall be initiated by the said medical director so that he is aware at all times of the status of the prison medical facilities in the Alabama system.

It is further ordered that the defendants shall make any and all of their facilities and medical records available to the representatives of the United States and the attorney for the plaintiffs for inspection.

The defendants shall prepare and file with this Court a report within six months of the date of this decree detailing the implementation of each item herein ordered. This report shall also include a statement of the financing of the Alabama Board of Corrections at the present time and of defendants' plans for securing whatever additional financing might be required.

It is further ordered that the defendants pay to the Clerk of this Court within not more than 30 days from the date of this decree the sum of $12,000 and the additional sum of $2,483.42, said sums to be, upon order of this Court, disbursed by the Clerk to the Honorable Joseph D. Phelps as a reasonable attorney's fee and the expenses necessarily and reasonably incurred in the representation of the plaintiffs and the members of their class.

It is further ordered that the costs incurred in this proceeding be and they are hereby taxed against the defendants.