N. H. NEWMAN et al., Plaintiffs,

v.

STATE OF ALABAMA et al., Defendants,

United States of America, Amicus Curiae.

Jerry Lee PUGH, for himself and all others similarly situated, Plaintiffs,

v.

Larry D. BENNETT, Individually and in his official capacity as Commissioner of the Alabama Board of Corrections, et al., Defendants,

Barry E. Teague, United States Attorney, Amicus Curiae.

Worley JAMES et al., Plaintiffs,

v.

Larry BENNETT, Individually and in his official capacity as Commissioner of the Alabama Board of Corrections, et al., Defendants,

The National Prison Project of the American Civil Liberties Union Foundation, Inc., and Barry E. Teague, United States Attorney, Amici Curiae.

Civ. A. Nos. 3501–N, 74–57–N and 74–203–N.

United States District Court, M. D. Alabama, N. D.

Feb. 2, 1979.

Philip H. Butler (Robison, Belser, Brewer & Mancuso), Montgomery, Ala., for Newman plaintiff.

Robert D. Segall (Hobbs, Copeland, Franco & Screws), and John L. Carroll, Montgomery, Ala., for Pugh plaintiffs.

George Peach Taylor, University, Ala., for James plaintiffs.

W. Scears Barnes, Jr., Alexander City, Ala., for Bd. of Corrections.

Larry R. Newman, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., for other defendants.

Barry E. Teague, U. S. Atty., M. D. of Ala., Montgomery, Ala., Stephen A. Whinston and Patricia Gail Littlefield, U. S. Dept. of Justice, Civil Rights Division, Washington D. C., for amici United States of America and Barry E. Teague, United States Attorney.

Ralph I. Knowles, Jr., University, Ala., Matthew L. Myers, and Alvin J. Bronstein, Washington, D. C., for amicus The National Prison Project of the American Civil Liberties Foundation, Inc.

Michael D. Waters, Legal Adviser to the Governor, State of Ala., Montgomery, Ala., for Governor Fob James.

## MEMORANDUM

JOHNSON, Chief Judge.

On October 4, 1972, this Court held that the failure of the Board of Corrections to afford the basic elements of adequate medical care to inmates in the Alabama Prison System constituted "a willful and intentional violation" of their rights under the Eighth and Fourteenth Amendments. *Newman v. Alabama*, D.C., 349 F.Supp. 278, 287. Four years later, when the Court issued its order in *Pugh v. Locke,* D.C., 406 F.Supp. 318 (1976), those same serious shortcomings persisted. What *Pugh* revealed, however, was that such shortcomings were endemic to every phase of the prison system's operation. The conditions of confinement then violated any judicial definition of cruel and unusual punishment. In September, 1978, hearings were held to determine the degree of compliance by the Board of Corrections with the *Newman* and

*Pugh* orders.[1] The overwhelming weight of the evidence presented at that time established that what was true in 1972 and 1976 is still true today. While some progress has been made, the Board of Corrections has not in several critical areas achieved substantial compliance with the Court's orders. The very fact of confinement in Alabama's Penal System continues to contravene the Eighth and Fourteenth Amendment rights of plaintiffs.

The response of the Board of Corrections in 1976 was that the state legislature had failed to provide adequate funds. Despite the clear command of the law that the state may not discount constitutional rights, the excuse of the Board remains that the legislature has been remiss. That excuse has no legal weight. It may be true that the legislature has failed to meet its constitutional responsibilities in this area. But what the evidence now so strikingly reveals is that even within funding limitations imposed by the legislature, the Board has failed to make a genuine effort at compliance. In area after area, the Board has made no serious attempt to determine what steps can be taken with present funds and to plan what can be accomplished with additional sums. The theme running throughout the evidence is a lack of professional leadership. The Court is compelled to conclude that there is no reasonable likelihood of effective cooperation and substantial compliance from the present Board of Corrections. The passage of three years since *Pugh* makes the need for comprehensive relief more urgent than ever.

## I. OVERCROWDING

All institutions are in compliance with the requirement that the number of inmates not exceed the design capacity of the facility. This goal has only been achieved, however, by creating a backlog of 1,800 state prisoners in the city and county jails throughout Alabama. It is undisputed that the conditions in the county jails are worse than any that exist in the state prisons. Alabama's city and county jails were not designed to house long-term detainees. The evidence suggests that in almost if not every instance they fall below the minimum constitutional standards set forth in the *Pugh* order. Overcrowding is the norm. There is no classification system in the jails, with the result that offenders of all types are placed together. The jails are unsanitary and in a state of disrepair, and inspections have disclosed that many are serious fire hazards. Medical care is practically non-existent. In most jails, the prisoners receive no meaningful work, no programs, no exercise. Overcrowding in the prisons has been relieved only at the price of aggravated violations of the rights of state prisoners in the county jails.

The Board has presented no long-term plan to solve this problem. There were plans to build two 400-person facilities with the money from the 1977 bond issue. Indecisiveness, coupled with rising costs, makes it likely that only one can be built with that money now. In its comprehensive plan submitted to the Court on January 17, 1979, the Board proposes to construct four institutions, which will provide 1,700 additional spaces by 1981. Even accepting the Board's optimistic timetable, the problem of state prisoners backed up in the county jails will not be ended. The Board's own projections indicate that there will still be almost 1,000 state prisoners in the city and county jails in 1981. And even that projection makes the questionable assumption that Fountain and Draper can be improved to meet minimum constitutional standards. This prospect of continued non-compliance with this crucial aspect of the Court's order requires further relief.

## II. CLASSIFICATION

In 1976, all prisoners were classified, and a system of classification was developed. Since that time, the system has deteriorated and no longer functions in accordance with

---

1. The findings and conclusions set forth in this memorandum are based upon the evidence presented at that hearing and the various reports filed with this Court by the plaintiffs, the amici and defendants.

the Court Order. The experts attributed the problem to a lack of leadership and concluded that a replacement was necessary to run the program. The Court adopts that testimony. The classification staff at the institutions are not properly trained, have an insufficient understanding of the purposes of classification, and operate with no professional guidance. No handbook or guidelines have been provided for the staff's use. It is not surprising, then, that procedures have broken down and inconsistent standards are being applied. Often the initial classification decision is not made by a multi-disciplinary team composed of a psychologist, classification specialist, and correctional counselor, but by the "classification specialist" acting alone. The Central Review Board, in reviewing classifications, also does not meet as a team, and it, too, operates without written criteria. More seriously, classification decisions are dictated by the disciplinary system. Indicative is the fact that the Central Review Board almost always reverses the institutional team when the warden recommends a higher custody classification. As a result, while the initial classification resulted in a determination that 700 prisoners should be classified "medium custody," the subsequent classification decisions by the Board have resulted in almost double that number being so classified. This development has had a detrimental impact on prisoners' access to jobs, activities, and programs. Indeed the classification system does not play its intended role in the assignment of institutional work. There, too, the recommendations of the wardens, none of whom are classification specialists, seem to be controlling. Meaningful classification has also been undercut by the continued employment of certain guidelines as absolute bars to pre-release or work-release programs. As a result, the highly successful Frank Lee Youth Center has had a vacancy rate of 30 to 50 out of 200 places despite the fact that there are hundreds of first-time offenders (for non violent crimes) at Draper and in the county jails who are potentially eligible for that program. Another result is that the current inmate population at Frank Lee, as in 1976, continues to be over 50 percent white, although the prison system population as a whole is predominantly black.

In addition to failing to maintain an adequate, ongoing classification process, the Board has failed to correct the "traumatic and stressful" conditions at its Kilby facility which render unreliable the initial testing and evaluation of new prisoners. The mingling of prisoners regardless of offense and propensity to violence, combined with the absence of security in the cellblocks and dormitories, is an invitation to violence of all kinds. One 18-year-old prisoner testified that he had been raped on four successive days during daylight hours while awaiting classification at Kilby. Effective and reliable classification of inmates, which in large part is the basis of the safety of all inmates, will not be achieved until these conditions are corrected. The problem is less one of money than of management.

## III. MENTAL HEALTH CARE

In *Newman*, the Court found that the mentally ill, the disturbed, and the retarded were unidentified and were dispersed throughout the prison population without treatment. The evidence upon this submission reflects that nothing has been done to correct the situation. There is now some effort at identification of those with mental problems. But the record of housing and treatment of such persons is one of total failure and non-compliance. What defendants deem the best facility for housing those with severe emotional and mental problems is the same 12 cell area at Kilby that was in use at the time of this Court's original hearing. Many of those with mental problems at Fountain, Holman, and Tutwiler are housed in segregation cells and in punitive isolation. The consensus of experts was that these cells were unfit for the housing of persons with mental problems. Many of the mentally disturbed are simply left in the general population, where they are particularly vulnerable to harassment and assault. Indeed, of the mentally retarded, more have been placed at Fountain—the most violent of the institutions—than at any other place.

The Court's order provides that those who require treatment in mental institutions be transferred there. Defendants admit that it is virtually impossible for inmates to be transferred to facilities operated by the Department of Mental Health. In the last two years, only 46 persons have been transferred, and most have been returned within 30 days after having been put on medication but not having received treatment.

Non-compliance also exists as to the requirement that the Board hire adequate numbers of mental health professionals and support personnel. The Board employs no psychiatrist either full-time or as a consultant. There is only one licensed clinical psychologist. He spends 80 percent of his time at Kilby. The other staff listed as "psychologists" are not trained clinical psychologists and are not licensed to practice psychology. Even these "psychologists" provide almost no counselling. At Holman, the staff of five devotes a total of 55 hours per week to counselling. At Tutwiler, there is no staff member available for counselling. Because of the lack of trained doctors, psychotropic medication is prescribed without proper supervision and controls.

As of May, 1978, there were no special programs or housing for the mentally retarded. Subsequently, 65 mentally retarded inmates were moved to a dormitory at Staton, and defendants indicate that they will be provided special education teachers. For the remaining identified mentally retarded inmates, the Board apparently has no program and no plan. Recently defendants have sought a federal grant to provide alcohol and drug counselling for inmates going into community release programs. But in spite of the evidence that 40 to 60 percent of the prison population abuses drugs, defendants in the last two years have afforded counselling for only a handful of prisoners.

In light of the clear mandate of the Court in this area, the minimal efforts at compliance by the Board reflect an attitude of deliberate indifference to the mental health needs of the inmate population.

## IV. PROTECTION FROM VIOLENCE

Further, the Court concludes from the evidence that robbery, rape, and assault remain everyday occurrences among the general prison population in Alabama. The dormitories particularly are still places of fear and violence. Defendants admit non-compliance with the requirement that guards be stationed in the living areas, including dormitories. The dormitories, they say, are too dangerous for the guards to enter. That fear is well taken. The number of reported incidents of prosecutable crimes of violence shows a steady increase over the last four years. And it is axiomatic in the prison setting that the number of unreported crimes far outnumbers those which are reported.

The Board has not taken the first steps to curb this pattern of violence which makes a mockery of the Eighth Amendment's protection against cruel and unusual punishment. The Board has deliberately ignored the requirement that guards be stationed in the dormitory units at night. Had the Board proceeded with alternatives such as sallyports or catwalks, it could be credited with a good faith effort to comply with the order. All too typically, however, such alternatives are mere talk. The random shakedowns conducted by defendants have not eliminated weapons in the prison population. The recommendation of the Legislative Prison Task Force that metal detectors be installed to check prisoners has not yet been acted upon. These failures are just additional evidence of the managerial incompetence of the Board and its staff, including the Commissioner, Deputy Commissioner and a good number of its wardens. The present correctional staff provide custody, but not security. Considering the other existing conditions, such a prison system is not constitutionally acceptable.

## V. LIVING CONDITIONS

The evidence indicates some improvement in the general level of cleanliness in the dormitories and food service areas. Toilet articles are now supplied to all prisoners, as

are clean bed linen and towels. The Board does not, however, provide adequate clothing. Underwear and socks are not provided at all, and, at Fountain, trousers are not furnished. These failings pale alongside those concerning the general sanitary and safety conditions in the prisons. In *Pugh*, this Court found that Alabama's penal institutions were "filthy." While there has been improvement, the evidence reflects that each of the major institutions falls far below all minimum health and safety standards. It is not necessary to recite in detail what plaintiffs' expert, a United States public health officer, found when he toured Draper, Fountain, Holman, and Kilby again after two years. The Court credits his testimony now as it did then. Fountain and Draper continue to be "unfit for human habitation." At both institutions, lighting, ventilation, and heating remain inadequate. The living and food preparation areas are infested with vermin and rodents. Fire safety is non-existent. After two years, many flammable mattresses remain in use,[2] guards have not been trained in evacuation, and fire fighting equipment is lacking. The food service at both prisons offers striking evidence of mismanagement. Food service personnel remain untrained, garbage is not properly handled, and equipment is not maintained.

The other institutions reveal similar problems. At Holman, lighting and ventilation remain unchanged. Temperatures in the living areas last winter were as low as 50 degrees. Fire safety also remains a problem. Indeed, flooding of the basement utility room has caused major electrical shortages and raises a serious risk of explosion. The roof and windows leak, posing a health hazard to inmates who must live and sleep in damp surroundings. The same public health problems exist at Kilby. At Tutwiler, these shortcomings are compounded by what the State Fire Marshal deemed a "major hazard to life and property" from the overloaded and deteriorated electrical system.

While a final solution to these problems awaits adequate funding by the legislature, the Court has not even been presented with evidence of that kind of improvement which could be expected from diligent management alone. Where the prison living conditions still pose an imminent danger to the health of inmates, the Board has not achieved compliance with minimum constitutional requirements.

## VI. FOOD SERVICE

As the discussion of living conditions suggests, food service is not in substantial compliance with the Court order. Inmates are now served three meals a day, and kitchen conditions have improved. But food is not prepared under conditions that meet minimum public health standards; equipment is not maintained in good working order; kitchen employees are not adequately trained; and food distribution to inmates in single cells remains essentially unchanged since 1976.

## VII. EDUCATIONAL, VOCATIONAL, WORK, AND RECREATIONAL OPPORTUNITIES

The Board has failed completely to provide meaningful work for all inmates. Idleness is prevalent throughout the system. Institutional work assignments are few and most take only a small time to perform. The number of industry jobs has declined by twenty since 1976. Even the jobs in the tag plant are seasonal. Since the Prison Industries Division was created in 1977, only one new industry with merely 30 jobs has been started. The Division has formulated no concrete plans for the development of further industrial programs. Plans to open a canning plant in conjunction with the new Staton prison were eliminated by the Board, and Staton opened with no jobs available other than institutional work assignments. As this Court noted in *Pugh*, the lack of meaningful work contributes to

2. The Alabama Board of Corrections' "plan" to acquire mattresses that meet the fire code requirements is to purchase them from the North

Carolina prison system, which system—with prison labor—makes them.

boredom and frustration. Those in turn contribute to violence and mental and physical degeneration. The failure of the Board to address this central problem reflects again its inability to convert talk into action.

Vocational education and work-release programs have been expanded. But here, too, substantial compliance has not been achieved because of management problems. Of 736 total spaces, more than 100 are vacant at any given time. In March, 1978, CETA funds were forfeited because the Board refused to parole or place on work-release trainees within a short period after graduation. As in 1976, eligibility requirements for most programs are quite strict. The breakdown of the classification system contributes to non-compliance in this area as well.

## VIII.  PHYSICAL FACILITIES

The Board has complied with paragraph (2) of this section to the extent that it has established work-release and other community-based facilities. But as the discussion of Living Conditions clearly reflects, Draper, Fountain, Holman, and Kilby do not meet all of the minimum standards of the United States Public Health Service. Therefore the Board is not in substantial compliance with this section.

## IX.  STAFF

The Board admits that it has failed to employ sufficient personnel as set forth in the Court's order. When Staton prison was opened, it was staffed with personnel drawn from the other institutions in the system. The total custodial staff is inadequate even under the revised staffing standards proposed by amicus National Prison Project on December 11, 1978.

## X.  MEDICAL CARE

Six years after *Newman*, the Board is still not in substantial compliance with the order entered in that case. The evidence reflects small gains, but glaring inadequacies have yet to be corrected. The most significant deficiency is in the quantity and quality of the medical staff. Of 105 authorized positions for medical staff, only 51 are filled. The system employs no full-time psychiatrist. Only the medical director is a licensed physician, and he is not full-time. Otherwise, the system is provided medical care by two unlicensed physicians with the title "physician's assistant," one physician with a limited license, and one with a suspended license. In addition, the Board has contracted with a group of residents to provide 20 hours of care per week at Fountain and Holman and with another physician to provide 5 hours of care per week for Draper, Staton, and Frank Lee. The medical director for Alabama's Prison System testified that the system needed at least four additional full-time physicians. Likewise, there is a need for four additional R.N.'s. At the present time, only Kilby is served by an R.N. This situation reflects almost no progress since 1972. Dental care, too, is inadequate with but one full-time and one part-time dentist for the entire prison system. Quotas have been assigned to each institution. The backlog of inmates waiting to see a dentist has resulted in care limited to extractions, with little or no rehabilitative work done. As previously indicated, mental care is non-existent.

No effort has been made to bring the Medical and Diagnostic Center at Kilby into compliance with the minimum Medicare standards as required by the Court. A lack of professionalism characterizes the administration of the prison hospital. Patients with different strains of hepatitis have been placed in the same ward at great risk to life. There is no hospital dietician and no medical records librarian. A laboratory technician has been serving as hospital administrator. These conditions amply reflect that the medical director has failed to comply with the order of the Court that he develop a program of continual evaluation of all facilities and all personnel. The delivery of medical care in the Alabama Prison System is not characterized by poor management, but by no management.

A general lack of supervision is evident with respect to other provisions of the *New-*

man order. The medication distribution system is lax and record-keeping is poor. Evacuation plans and written sanitation procedures, if in existence, are not referred to and utilized. The medical facilities have not been regularly inspected by the Fire Marshal and the Health Department. While the experts who testified disagreed about the need for specific items of medical equipment, there is no dispute that what equipment is ordered arrives only after long delays. Emergency transportation to free-world medical facilities is often unreliable because of the lack of security personnel. And the simple task of preparing job descriptions has not been completed.

The natural consequence of this understaffing and inadequate supervision is the continued evidence of medical treatment performed by inmates. One inmate testified that he gave injections and performed a hemorrhoidectomy; another testified that he filled teeth and performed dental surgery, for guards as well as for inmates.

The cumulative effect of these deficiencies and abuses is a threat to life and limb that violates the Eighth Amendment. The Board of Corrections' continued non-compliance with the minimum constitutional requirements set down by the Court conclusively establishes that there is no reasonable likelihood of compliance in the near future from that quarter.

\* \* \* \* \* \*

▇▇▇ Time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years. Their time has now run out. The Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case. Plaintiffs are entitled to prompt and effective relief. Living conditions that constitute an imminent danger to health; inadequate medical care that poses a threat to life; and insufficient security that sanctions the law of the jungle—these facts describe a state of emergency demanding decisive action. It is clear that the Board of Corrections is incapable of effective leadership. Difficult as the Board's position was made by the

lack of adequate funding, the Court finds that the Board could have ameliorated the conditions confronting it, but instead contributed to the gravity of the situation by its indifference and incompetence. The lack of any significant progress since the original hearings in this case strongly suggests that the appointment of monitors offers little, if any, hope of swift compliance. The extraordinary circumstances of this case dictate that the only alternative to non-compliance with the Court's orders is the appointment of a receiver for the Alabama prisons. The Court will thus grant that relief, first requested by plaintiffs in June, 1978. Further injunctions or contempt proceedings will not accomplish the task of compliance; such remedies promise only confrontation and delay. When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction. *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976); *see, Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1276, 28 L.Ed.2d 554 (1971); *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Griffin v. County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Turner v. Goolsby*, 255 F.Supp. 724 (S.D.Ga.1966). There is, of course, a more extreme alternative to a receivership. In *Pugh*, the Court put defendants on notice that failure to comply with the minimum standards set forth in the order would necessitate the closing of several prison facilities. In light of that alternative, the more reasonable and the more promising approach is the appointment of Governor Fob James as receiver for the prison system.

▇▇▇ There can be no doubt that the paramount duty of the federal judiciary is to uphold the law. That is why, when a state fails to comply with the Constitution, the federal courts are compelled to enforce it. The habit that some states have fallen into of ignoring their responsibilities until they are faced with a federal court order is by now an all too well-known syndrome. The history of federal litigation in Alabama is

replete with instances of state officials who could have chosen one of any number of courses to alleviate unconstitutional conditions of which they were fully aware, and who chose instead to do nothing. Consequently the federal courts time after time have been required to step into the vacuum left by the state's inaction. Regrettably, such orders result in the loss of some of the autonomy and flexibility the state might have exercised in the control of its public institutions had it chosen to accept the responsibility for their management before it was too late. That responsibility is one the Court will gladly relinquish to those who are elected to do it, if they are willing to undertake it. As this Court has publicly stated upon many occasions: "The Court looks forward to the day when responsible officials of the State of Alabama will assume their constitutional and legal obligations to run the state institutions in a manner that does not violate the Constitution and laws of the United States. Such a course of action would, of course, enable this Court to relinquish its substantial control of Alabama's governmental operations." By his petition to be appointed receiver, Governor James appears to have accepted that mantle of responsibility as far as the operation of the Alabama Prison System is concerned. Accordingly, an order will be entered appointing him receiver of the Alabama Prison System for the purpose of complying with the minimum requirements of the Constitution as embodied in this Court's previous orders.

## ON PETITION OF GOVERNOR OF ALABAMA FOR APPOINTMENT AS TEMPORARY RECEIVER

Petitioner, Fob James as Governor of the State of Alabama, moves the Court that he be designated temporary receiver in the above entitled actions, for a period of not less than one year, and that this Court order the defendant members of the Board of Corrections of the State of Alabama (hereinafter "Board") to transfer to Petitioner, as such receiver, all of its functions, duties, powers and authority to manage, supervise and control all penal and correctional institutions in the State of Alabama and all other duties and functions imposed upon the said Board under the laws of Alabama, including without limitation, the power to hire, discharge, suspend and supervise the Commissioner of Corrections, deputy commissioners, and any other personnel employed by the Board. Petitioner further moves that the Court enjoin all members of the Board, and all other defendants in these actions, their agents, servants, employees, and all persons in active concert or participation with them, from interfering in any manner, either directly or indirectly with the performance of his functions and duties as such receiver.

In support of this petition, Petitioner assigns the following:

Petitioner officially assumed the office of Governor of Alabama on January 15, 1979. Under the Constitution of Alabama, the supreme executive power of the state is vested in Petitioner (§ 113); and the constitutional duty is imposed upon him as Governor to take care that the laws be faithfully executed (§ 120).

Of intense concern to Petitioner in the performance of his duties as Governor, and in seeing to it that the laws are faithfully executed, are the establishment, maintenance and proper operation of a corrections system in the State of Alabama in accord with, and not in contravention of, the guaranties of the Constitution of the United States and of the State of Alabama. Indeed, an effective corrections system, legally and constitutionally operated, directly involves the safety and welfare of the citizens of the State of Alabama.

Petitioner knows that in its orders of January 13, 1976 (hereinafter the "Court Order"), after an extensive trial, this Court found—and indeed the state through its attorney general conceded—indefensible conditions involving overcrowding; segregation and isolation; inadequate classification; physical and mental health care; protection from violence; inmate living conditions; unsanitary food service; unmeaningful work, recreation and education opportunities; and physical facilities and staff.

Petitioner is aware of three basic thrusts which underlie this Court's Order, and are at its core. First there is to be a meaningful work program. This is essential to prevent all of the unfortunate ramifications of inmate idleness and indolence which persist month after month, and year after year. The evils of this condition may well have lain at the root of the crimes which got these prisoners into prison. Elimination of this condition by a meaningful work program means the development of self-discipline and useful skills; the fatigue which produces sleep instead of mischief at the end of a hard day's work; and the generation of money to help operate the prison system and to reduce the costs of other state agencies.

The second essential thrust of the Court Order is the protection of the inmates from physical and sexual assault by other inmates.

Third is the availability of a basic education program.

Petitioner is aware that the Court Order has not been complied with and that the deadlines fixed by this Court have long since passed. Petitioner knows that as recently as January 17, 1979, the members of the Board have made known to the Court that they have not yet achieved compliance with the Order.[1]

Petitioner is aware that on June 10, 1976, the Legislature of Alabama accorded permanent status by Joint Resolution No. 126 to a Legislative Prison Task Force (hereinafter "Task Force") to monitor the operation of the Alabama corrections system and the implementation of standards and requirements contained in the Court Order. Among the members of that Task Force were the present Lieutenant Governor, Honorable George D. H. McMillan (then Chairman of the Task Force), and the present Speaker of the House of Representatives, Honorable Joe C. McCorquodale, Jr. On August 17, 1976, responding to a resolu-

tion of the Senate of Alabama, this Court designated and appointed the Task Force to monitor the operation of the Alabama corrections system and the implementation of the Court Order, and subsequent orders in these cases. Petitioner has been advised by Lieutenant Governor McMillan and Speaker McCorquodale that the primary reason for a failure of compliance with the standards and requirements of the Court Order, and the concomitant failure to maintain and operate an effective, legal and constitutional corrections system in Alabama, is inadequate and inefficient management. Moreover, the Lieutenant Governor and Speaker have advised Petitioner that it is imperative that this Court appoint Petitioner, as Governor, the temporary receiver to supervise the management and operation of the Alabama prison system.

Petitioner is aware that the plaintiffs in these actions, in papers filed on June 19, 1978, asked this Court to designate a temporary receiver with all the powers of the Board and Commissioner of Corrections to operate the prison system of Alabama until such time as the receivership is no longer needed to assure compliance with minimal constitutional standards.

Petitioner is informed and believes that the Alabama prison system is in a distress situation and that compliance with the standards and requirements of the Court's Order, and the achievement as well of the goal of an effective prison system maintained and operated in the interest of the safety and welfare of the citizens of this state, require the assertion of the extraordinary equitable powers of this Court. The more usual remedies heretofore pursued by this Court have not produced these desired results, but instead have invited confrontation and delay. A receivership is essential to get the job done. See *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976), cert. denied 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755.

1. Indeed, the Board's plan for construction by June 1, 1981, contemplates housing accommodations for 5,772 inmates, when its own projected housing requirements by September 30, 1980, show 6,839 inmates. Thus the plan would continue to keep over 1,000 state inmates in county jails.

Upon appointment as such temporary receiver, Petitioner, consulting and cooperating closely with the Lieutenant Governor and Speaker of the House, expects to do the following:

1. Secure and appoint to assist him a person or persons as able and experienced in the management of correctional institutions as are available.

2. Make certain that the result of the emergency classification project heretofore ordered by this Court has produced meaningful classification within the prison system. If it has not, then meaningful classification throughout the system shall be immediately completed on a crash basis within a matter of weeks; and continued monitoring will be undertaken to assure its effective implementation on a permanent and ongoing basis. Sound reclassification will help safeguard prisoners from violent assaults; reduce the requirements for more guard personnel; and hopefully eliminate the need for more than one maximum security prison.

3. Establish and maintain effective internal security and inmate safety. Included in the means of safeguarding inmates and providing for their safety will be regular procedures for frequent and unscheduled shakedowns, and effective inspection to prevent the introduction of contraband of all kinds. Excellent security studies, made sometime ago by University of Alabama in Birmingham, will be implemented.

4. Promptly institute measures, including the prompt construction of needed facilities—planned on a professional and meaningful basis—to eliminate overcrowding in the state prisons, and the unfortunate and lamentable retention in county jails of persons who have been convicted of crimes and sentenced to prison.

5. Introduce a meaningful work program. There has been a severe underutilization of industrial, agricultural and plant maintenance programs. There has been a marked absence as well of a prison industrial system to provide a meaningful work program for inmates; to reduce the operating costs of the prison system; and to reduce such costs to other state agencies as well. Petitioner will draw upon detailed plans, including graphic materials such as films, which have heretofore been brought to the attention of the Board so that inmates will be put to hard work on meaningful jobs and so that the prisons can be ultimately self-sustaining and help reduce the operating costs of other state agencies.

6. This state by legislation has established a single education district for inmate instruction. Inmate education will be conducted largely under the supervision of the State Department of Education, and persons designated by that Department will have primary responsibility for the development of vocational and academic programs within the prison system which comply with the Court Order. Petitioner will use on a vastly expanded basis the excellent facilities afforded by the state's many trade schools and junior colleges. Quite apart from humanitarian reasons, Petitioner is convinced that the education of prisoners, and the chance of their rehabilitation, directly involve the safety of society. There is clearly no guarantee that a prisoner—adequately educated—will be a better person when he gets out because he has enough education and training to obtain and hold a job. But if he gets no training or education at all, it is absolutely certain that he—and another 98 percent of the prison population like him—will commit other crimes when they get out.

7. Petitioner will proceed immediately to secure the services of the most competent available medical director. The recruitment of such a director is absolutely essential to the establishment and maintenance of proper physical and mental medical care. Petitioner will seek to draw upon the excellent medical resources and medical schools of this state.

Petitioner will seek to coordinate the medical treatment of inmates with programs in the state medical schools. He will promptly form a planned relationship with these schools, including areas of diagnosis which could be conducted by residents or interns under the supervision of a medical

director. Obviously different types of treatment—related to degrees of severity—can be conducted at different locations—some within the prisons and others (of a more serious nature) at outside institutions.

8. Petitioner will see to it that inmate living conditions—including the cleanliness of living areas, physical facilities, personal materials, and sanitary food service—will accord with the standards set in the Court Order.

In the event that funds beyond those appropriated by the legislature are necessary for the accomplishment of the foregoing, Petitioner will use his best efforts to secure necessary funds with due regard to the budgetary needs of other state agencies.

Petitioner considers that the prompt achievement of these goals, of the standards set in the Court Order, and the establishment, maintenance and operation of an effective corrections system are among the paramount duties of his office, and directly involve the constitutional performance of his duty to see to it that the laws are faithfully executed. But as the Court of Appeals concluded in this litigation (*Newman v. Alabama*, 5 Cir., 559 F.2d 283, 292), the Governor of Alabama "has no hand in the operations of the Alabama penal system beyond the customary budget recommendations to the legislature and the appointment of the Alabama Board of Corrections. The statute vests all power and control in the Board."

Accordingly, if Petitioner is to be able to perform this important task for the citizens of Alabama as their governor, it is imperative that this Court appoint Petitioner temporary receiver.

WHEREFORE, Petitioner prays that the Court appoint him a temporary receiver upon the terms and in the manner and pursuant to the orders described in the opening paragraph of this petition.

s) FOB JAMES, GOVERNOR OF THE STATE OF ALABAMA, Petitioner.

We, the undersigned, concur in the foregoing Petition of the Honorable Fob James, as Governor of Alabama, and request that this Honorable Court grant it.

s) George D. H. McMillan, as Lieutenant Governor of the State of Alabama

s) Joe C. McCorquodale, as Speaker of the House of Representatives of the State of Alabama

s) Finis E. St. John, III, as President Pro-Tem of the Senate of the State of Alabama

s) Richard S. Manley, as Speaker Pro-Tem of the House of Representatives of the State of Alabama

s) Charles A. Graddick, as Attorney General of the State of Alabama