Robert FINNEY et al.

v.

James MABRY et al.

No. PB–69–C–24.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Oct. 5, 1978.

See also, D.C., 455 F.Supp. 756.

Philip E. Kaplan, Jack Holt, Jr., Phillip H. McMath, Little Rock, Ark., for plaintiffs.

Bill Clinton, Atty. Gen. of Ark., Robert M. Lyford, Deputy Atty. Gen., James E. Smedley, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## CONSENT DECREE

EISELE, Chief Judge.

The parties, through their respective counsel, have reached an agreement or an accord for resolving the issues in the above captioned lawsuit. They seek the Court's sanction of that agreement through means of a Consent Decree and judicial approval of the same. Being satisfied that the pro-

posed Consent Decree will reasonably resolve the issues raised by the parties, the Court hereby gives its tentative approval hereto and enters the following Order and Decree.

### I.

The individual named petitioner is Robert Finney (hereinafter the "petitioner"). The individual named respondent is James Mabry, Commissioner of the Arkansas Department of Correction (hereinafter the "ADC").

### II.

The affected class whose interests are represented by petitioner consists of all past, present and future inmates confined in the correctional institutions of the Arkansas Department of Correction.

### III.

The respondent, ADC, by entering into this decree makes no admission of any violation of constitutional rights of any specific inmate, whether in or out of population, not heretofore adjudicated.

### IV.

The respondent enters into this settlement and Consent Decree solely for the purpose of maintaining a humane prison system consistent with the Constitution and laws of the United States and the State of Arkansas.

### V.

The ADC will honor all prior orders and injunctions, including but not limited to the following:

(1) No ADC employee will use excessive force against any inmate.

(2) No ADC employee will verbally abuse, curse or use racial slurs when addressing or talking with inmates.

(3) Reasonable and necessary medical, surgical and dental care will be provided to all inmates, and no inmate will be assigned to do work beyond his or her physical capability.

(4) Reasonable and necessary mental health care will be provided to all inmates.

(5) The ADC will maintain an internal grievance procedure, no less restrictive than the present procedure, and inmates are encouraged to utilize the same.

(6) ADC officers assigned to the East Building will be rotated on a regular basis.

(7) Inmates will not be required to run to and from work as part of their job and training.

(8) No more than two inmates will be placed in any one punitive segregation cell, and bunks will be provided for each on which to sleep, except for emergency situations.

(9) Each inmate in punitive segregation will receive a proper diet daily. Grue will no longer be served as a punitive measure.

(10) No inmate will be confined in punitive segregation for more than thirty (30) consecutive days for any one disciplinary episode. If at the end of thirty days it is found that the inmate should not be returned to the population, he may be kept segregated but under conditions that are not punitive in accordance with the court order as recorded in *Finney v. Hutto*, 410 F.Supp. 251 and *Hutto v. Finney*, —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

(11) No more than two inmates will be confined in any two-man administrative segregation cell, and no more than four inmates will be confined in any four-man administrative segregation cell, and bunks for each to sleep on will be provided, except for emergency situations.

(12) The assistant superintendent in charge of security of the Cummins Unit will re-evaluate inmates confined in the East Building, except for those in-

mates on investigative status or serving a punitive sentence or death sentence at least once each sixty (60) days, and the warden of the Cummins Unit will review the cases of the same category of inmates at least once a year.

(13) Damage done to the East Building by inmates will be repaired as soon as practical.

(14) All major disciplinary committees at the various units of the ADC will be administered in accordance with the guidelines set out in *Wolff v. McDonnell* and Judge Eisele's Memorandum Opinion of June 30, 1978.

(15) Before an inmate can be found guilty of malingering by a disciplinary committee or a panel thereof, the committee or panel must consult with the doctor or other person who examined the inmate and determine that in the opinion of the examiner the accused inmate was in fact a malingerer on the occasion in question.

(16) The charging officer will not sit as a member of the disciplinary committee hearing that particular charge.

(17) The disciplinary committee will not adjudicate charges solely on the basis of an officer's investigatory report of what some unnamed person told him. The committee must have before it the name and statement of the witness with first-hand knowledge of the infraction.

(18) If weapons or contraband are the basis of the charge and the officer has these items in his possession, they must be presented to the disciplinary committee for its inspection.

(19) Tape recordings of all disciplinary hearings will be carefully maintained by the various units of the ADC for a period of three years.

(20) Inmates accused of major infractions will be given a hearing within 72 hours after the occurrence of the disciplinary episode, exclusive of weekends and holidays, and the superintendent may grant limited extensions of time.

(21) Insofar as possible, major disciplinary hearings will be conducted on weekdays between 6:00 A.M. and 6:00 P.M.

(22) All inmates accused of major infractions will receive a copy of the charge at least twenty-four (24) hours prior to the hearing.

(23) All other regulations set out in the *Inmate Handbook* concerning disciplinaries will be strictly followed by the ADC personnel.

(24) All regulations concerning inmate mail in the *Inmate Handbook* will be strictly followed by the ADC personnel.

(25) The services of the Legal Adviser to the Inmates will continue to be made available to inmates as described by the Court in *Finney v. Hutto,* 410 F.Supp. 251, at 262 and 263.

(26) Law libraries will be maintained by the ADC at the Cummins, Tucker and Women's Units for use by inmates. Inmates confined to other units of the ADC and inmates on restrictive status, such as punitive or administrative segregation, will be provided legal books and material in accordance with the rules and regulations of their respective units.

(27) The ADC will not discriminate against Muslims on account of their religious beliefs.

(28) Muslims will not be served pork against their will, and no food that has been in contact with pork or pork grease or lard made from pork fat will be served to members of the Muslim religion.

(29) Muslim inmates of the East Building are entitled to the same, but no greater, privileges in the area of religious worship, including visits by clergymen, as are accorded to inmates of the East Building who profess other religious faiths. However, these visits are subject to the security risk of the inmate and the institution.

(30) Allegations of excessive force against inmates by ADC employees will be formally investigated at once and reduced to writing by the ADC and will include the inmate's version of the incident.

(31) The ADC, subject to modification by the Court, will limit its inmate population at Cummins to 1650, and the inmate population at Tucker will be limited to 676.

(32) Two-hundred inmates will be moved out of the house trailers now in use at the Cummins Unit of the ADC by January 1, 1979. The remainder of the inmates in the house trailers at the Cummins Unit of the ADC will be moved out by October 30, 1979, or sooner if additional living space is available. Use of the gym and Fifteen Barracks at the Cummins Unit of the ADC for the housing of inmates will not be allowed after October 30, 1980, or sooner if additional living space is available. In the event that the Benton Work Release Center has to be closed by virtue of actions beyond the control of the Board of Correction and there are no other appropriate work release facilities available at that time, the ADC may then make application to the Court for modification of the aforementioned deadlines.

(33) The quiet cells, located in the East Building of the Cummins Unit, will be used only to house inmates who are violent and who cannot be controlled in any other manner. An inmate will remain in the quiet cell no longer than necessary.

(34) Adequate clothing will be provided for all inmates, and additional clothing and footwear will be made available for specific job assignments.

(35) Transfers from Tucker to Cummins must be evaluated not later than two weeks after arrival at Cummins, with a second evaluation not later than thirty (30) days thereafter and an additional evaluation every ninety (90) days for the purpose of determining if the inmate should be returned to Tucker. This provision will not apply to persons twenty-two (22) years old or older.

(36) Towels, linen, and soap will be provided to all inmates for personal hygiene and cleaning apparatus will be provided for inmates to clean their respective living area.

(37) Black employees will be assigned to all ADC internal committees on the same basis that white employees are assigned.

(38) Within three (3) months after court approval of this decree or sooner, the ADC will formulate a written personnel policy, consistent with the laws of this state, regarding the use of force during an escape attempt.

(39) No ADC employee will retaliate against or threaten to retaliate against any inmate for having petitioned for judicial relief or for having testified or for having offered to testify in any judicial proceeding.

## VI.

The Court approves the agreement of the parties that the ADC cooperate with all law enforcement agencies in investigating and prosecuting crimes occurring within the ADC by anyone.

## VII.

The Court approves the agreement of the parties that the ADC institute an affirmative action program for the recruitment and promotion of Blacks to decision-making positions within the ADC. The following mechanism will be employed to carry out this obligation.

(1) The immediate assessment of all Black employees of the ADC for promotions to vacant positions of authority.

(2) The continuation of a personnel office within the ADC.

(3) The establishment of an employment referral service with the Urban League of Greater Little Rock.

(4) Listing of all job vacancies with the Placement Office of the University of Arkansas at Pine Bluff.

(5) Continuation of the ADC's present policy of hiring personnel, regardless of race.

## VIII. .

For purposes of demonstrating compliance with all relevant orders of this Court and for the timely removal of this Court's jurisdiction, the Commissioner of Correction, the Attorney General, and counsel for plaintiffs shall, within forty-five (45) days, agree upon a person with suitable legal, administrative and humanistic skills, to serve as Compliance Coordinator for the ADC. Failure to agree within the specified time period shall constitute a basis for setting aside this decree.

The agreement of employment of the Compliance Coordinator shall include the following provisions:

The Compliance Coordinator is authorized to select and hire one fulltime clerk/secretary. Adequate office space, equipment, supplies and operation expenses shall be made available by the ADC. The office of the Compliance Coordinator shall be located in the Pine Bluff area; however, the office space shall not be within any facility of the ADC.

The Compliance Coordinator is not to act as an arbitrator of disputes between the inmates and the staff of the ADC or to inject himself in any way into the routine activities of the staff, various boards and committees. His function will be to study and evaluate all of the various reports that have been filed in this matter to date and to determine what remains to be accomplished for purposes of compliance with the elements of this consent decree and what further reports and evidence are necessary to show whether and to what extent present administrative regulations and practices are in compliance with this decree.

In order to carry out his duties, the Compliance Coordinator shall have unlimited access to any facilities, buildings, or premises under the control of the ADC. However, in an emergency the Compliance Coordinator shall cooperate with the Director of the ADC and the wardens of the respective units of the ADC or their designees in order to assure that efforts to terminate the emergency will not be unduly disrupted. He shall also have access to any records, files or papers maintained by the ADC. Access to these records, files or papers shall be granted at any time, and no advance notice shall be necessary. He shall have the same access to these records, files or papers as the commissioner of the ADC. His use and dissemination of any material contained in these records, files or papers shall not be inconsistent with applicable Arkansas state law or federal law.

The Compliance Coordinator is authorized to conduct confidential interviews at any time, without advance notice, with any staff member or employee of the ADC or any inmate thereof, consistent with the security needs of the institution. The Compliance Coordinator may attend any institutional meeting or proceeding when such attendance is not inconsistent with applicable Arkansas state law.

The Compliance Coordinator may require written reports within reasonable periods of time from the Commissioner or his designee with respect to compliance with and implementation of any Court order.

The ADC shall post notices throughout its various units stating that a Compliance Coordinator has been appointed who may from time to time visit the institution and talk to staff members or inmates as he shall desire. These notices shall emphasize that the Compliance Coordinator's only function is to determine the state of compliance with the orders of the Court; that his appointment is not to be considered as providing any substitute for, or addition to, the regular grievance and disciplinary procedures of the institution; that he is not to arbitrate or to interfere in any way with the disposition of grievances or complaints of individual inmates or staff members; that if the Compliance Coordinator desires information from either inmates or staff with respect to

such matters, or any other matters, he will specifically request such information. These notices shall remain posted until the Compliance Coordinator has been discharged.

Ninety days after his appointment, the Compliance Coordinator shall file his first report with the Commissioner, the Board of Correction, counsel for plaintiffs, the Attorney General and with the clerk of the Court. He shall, every three months thereafter, file similar quarterly reports with each of the above-designated recipients. Each month he shall file a separate report with the Commissioner of Correction and counsel for the plaintiffs at least one week prior to the scheduled meeting of the Board of Correction. Each of the above-mentioned reports shall address the provisions listed in paragraphs V through VIII of this decree and evaluate the ADC's compliance therewith. The Compliance Coordinator shall also report on any orders or injunctions not covered in paragraph V through VIII, but presently enforced, upon written request by any of the parties herein. Further, each report shall specifically address the operation of the disciplinary committees at the various units of the ADC to evaluate compliance with the guidelines established in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and related cases. Each report should, with respect to each particular finding therein, state the evidentiary basis for the finding, whether observation, interview, statistics, hearings or any combination thereof. Also, as to each item of order, the report should show:

 (1) the state of compliance;
 (2) any applicable departmental regulations and present practices;
 (3) the degree of cooperation given the Compliance Coordinator by members of the ADC, specifically naming any members who had been uncooperative and the details of their lack of cooperation; and
 (4) a timetable for establishing full compliance with any portion of the order which the Compliance Coordinator finds has not been fully implemented.

In no event is the Compliance Coordinator authorized or permitted to release pertinent information to any person or agency other than the designated recipients.

At no time will the ADC be bound to follow any specific recommendation of the Compliance Coordinator; however, any refusal to do so is subject to review by this Court upon petition by the Commissioner, the Board of Correction, Counsel for the plaintiffs, or the Attorney General.

As soon as is practicable, but no sooner than eighteen months after his appointment, the parties with the assistance of the Compliance Coordinator, shall submit to the Court a comprehensive final report demonstrating all aspects of compliance and recommending the relinquishment of further jurisdiction by this Court.

At any time after eighteen months, any party receiving reports can petition the Court for a final report and relinquishment of jurisdiction. Within three months after receiving the final report, this Court, if satisfied with said report, shall relinquish further jurisdiction over the ADC and discharge the Compliance Coordinator. The reports filed pursuant to this paragraph with the Clerk of the U. S. District Court shall be immediately sealed by the Clerk and not opened for inspection by anyone except on order of the Court.

IX.

This decree is intended to fully resolve all issues between the parties in the consolidated actions herein relating to the alleged denial of rights to inmates secured by Title 42 U.S.C. Sec. 1981 and Sec. 1983 and rights and immunities guaranteed by the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. The Court tentatively concludes that this decree, when finally entered, shall terminate the present hearings which are scheduled to resume this year, and acceptable reports over the next eighteen months shall constitute compliance by the ADC with the abovementioned laws.

## X.

The cost of this action which includes counsel fees shall be borne in full by the ADC and shall be satisfied in the usual manner. If the parties are unable to resolve the matter of costs and counsel fees, they may submit the matter to the Court for determination.

## XI.

The provisions of this decree shall remain in effect for a period of eighteen months after this agreement is entered into, or until such time as the objectives set forth herein are achieved, whichever occurs first.

## XII.

This consent decree is approved and adopted by the Arkansas Board of Correction contingent upon funding approval from the Legislative Council or other sources.

WHEREFORE, the Court approves, adjudges and decrees that the Consent Decree be, and is, hereby tentatively approved with instructions to cause to be posted at various units of the ADC the notices and other information contained herein within ten (10) days from the date of this Decree.