BROWN v WAYNE COUNTY SHERIFF

PEOPLE v BLOUNT

Docket Nos. 61875, 62006. Argued October 3, 1979 (Calendar Nos. 12, 13).—Decided December 23, 1982.

Charles Brown and Alphonsa Blount were separately convicted of armed robbery in Alabama and were imprisoned at Atmore State Prison. Both escaped and were arrested in Michigan. The Governor of Alabama requested extradition in both cases, and the Governor of Michigan issued warrants for extradition. Brown and Blount separately petitioned in the Recorder's Court of Detroit for writs of habeas corpus on the ground that they were subjected to cruel and unusual punishment while imprisoned in Alabama and that they again would be subjected to such punishment if returned to Alabama. The Recorder's Court, George W. Crockett, Jr., J., initially granted Blount's petition. The Court of Appeals, J. H. Gillis, P.J., and N. J. Kaufman and M. J. Kelly, JJ., set aside the order of the Recorder's Court, noting that changes had been made in the Alabama prison system since the lower court had conducted its hearing (Docket Nos. 77-2474, 77-2475). Blount appeals. In *Brown,* the Recorder's Court, Michael J. Connor, J., denied the writ. The Court of Appeals, D. C. Riley, P.J., and J. H. Gillis and N. J. Kaufman, JJ., dismissed an original complaint for a writ of habeas corpus (Docket No. 78-2587). Brown appeals.

In an opinion by Justice Levin, joined by Chief Justice Fitzgerald and Justices Kavanagh and Williams, the Supreme Court *held:*

A state court in an asylum state, faced with extradition papers proper on their face and a governor's warrant for the arrest and extradition of a fugitive from the demanding state's

REFERENCES FOR POINTS IN HEADNOTES

[1] 39 Am Jur 2d, Habeas Corpus §§ 76, 77.
[2] 31 Am Jur 2d, Extradition §§ 4-6.
[3] 31 Am Jur 2d, Extradition § 66.
  39 Am Jur 2d, Habeas Corpus § 78.
[4] 31 Am Jur 2d, Extradition § 74.
[5, 6] [No reference]

penal system, may not inquire into the constitutionality of prison conditions in the demanding state.

1. The Constitution of the United States provides that a fugitive from one state who is found in another shall, upon demand of the state having jurisdiction of his crime, be delivered up to that state. The courts of an asylum state are bound by that provision, the federal statute implementing it, and, where adopted, by the Uniform Criminal Extradition Act.

2. Interstate extradition was intended to be a summary and mandatory executive proceeding. A governor's grant of extradition is prima facie evidence that constitutional and statutory requirements have been met. Once a governor has granted extradition, a court in the asylum state, upon petition by a fugitive for habeas corpus, can do no more than decide whether the extradition documents on their face are in order, whether the petitioner has been charged with a crime in the demanding state, whether the petitioner is the person named in the request for extradition, and whether the petitioner is a fugitive. Any claim of unconstitutionality relative to the treatment of the fugitive in the demanding state must be tested in the courts of that state. To allow plenary review in the asylum state of issues which can be fully litigated in the demanding state would defeat the plain purposes of the summary and mandatory procedures authorized by the constitution.

3. In these cases, it appears that the conditions in the Alabama prison system fail to comport with the requirements of the Eighth Amendment. In recognition of the possibility that the interpretation by the Supreme Court of Michigan of the guidance offered by the Supreme Court of the United States is incorrect, the execution of the extradition warrants is stayed until either the appropriate time for seeking certiorari in the Supreme Court of the United States has elapsed, or that Court denies certiorari.

Justice Ryan, joined by Justice Coleman, concurring in part and dissenting in part, agreed that a state court in an asylum state may not inquire into the constitutional defects of the prison system in a demanding state once a claim of extradition has been properly made, but wrote that in view of the clear precedent from the Supreme Court of the United States a stay of extradition until an appeal to that court, not requested by the appellants, is pursued is unwarranted.

Affirmed.

OPINION OF THE COURT

1. EXTRADITION — FUGITIVES — HABEAS CORPUS — CONSTITUTIONAL LAW.

   A state court in an asylum state, faced with extradition papers proper on their face and a governor's warrant for the arrest and extradition of a fugitive from the demanding state's penal system, may not inquire into the constitutionality of prison conditions in the demanding state in passing upon the fugitive's habeas corpus petition (US Const, art IV, § 2; 18 USC 3182; MCL 780.1 *et seq.;* MSA 28.1285[1] *et seq.).*

2. EXTRADITION — FUGITIVES — CONSTITUTIONAL LAW.

   The courts of an asylum state are bound by the provision of the Constitution of the United States that a fugitive from one state who is found in another shall, upon demand of the state having jurisdiction of his crime, be delivered up to that state, by the federal statute implementing the provision, and, where adopted, by the Uniform Criminal Extradition Act (US Const, art IV, § 2; 18 USC 3182; MCL 780.1 *et seq.;* MSA 28.1285[1] *et seq.).*

3. EXTRADITION — FUGITIVES — HABEAS CORPUS — CONSTITUTIONAL LAW.

   Interstate extradition was intended to be a summary and mandatory executive proceeding; a governor's grant of extradition is prima facie evidence that constitutional and statutory requirements have been met, and, once it is granted, a court in the asylum state, upon petition by a fugitive for habeas corpus, can do no more than decide whether the extradition documents on their face are in order, whether the petitioner is the person named in the request, and whether the petitioner is a fugitive (US Const, art IV, § 2; 18 USC 3182; MCL 780.1 *et seq.;* MSA 28.1285[1] *et seq.).*

4. EXTRADITION — FUGITIVES — CONSTITUTIONAL LAW — CRUEL AND UNUSUAL PUNISHMENT.

   A claim of unconstitutional treatment of a fugitive in a state demanding his extradition, including allegations of cruel and unusual punishment, must be tested in the demanding state; to allow plenary review by courts of the asylum state of issues which can be fully litigated in the demanding state would defeat the plain purposes of the summary and mandatory extradition procedures authorized by the Constitution of the United States (US Const, art IV, § 2, Am VIII; 18 USC 3182; MCL 780.1 *et seq.;* MSA 28.1285[1] *et seq.).*

5. EXTRADITION — FUGITIVES — CONSTITUTIONAL LAW — STAYS OF
EXECUTION.

Extradition of fugitives was stayed, notwithstanding a holding of
the Supreme Court of Michigan that the Constitution of the
United States, federal implementing legislation, and the Uni-
form Criminal Extradition Act, require extradition and that
findings by a federal court of unconstitutional treatment of
prisoners in the demanding state, under federal law, may not
be considered in determining whether to execute extradition
warrants, in recognition of the possibility that the Supreme
Court of Michigan had misinterpreted the guidance offered by
the Supreme Court of the United States, until either the
appropriate time for filing a petition for certiorari with the
Supreme Court of the United States elapses without the filing
of a petition by the fugitives or until certiorari is denied (US
Const, art IV, § 2; 18 USC 3182; MCL 780.1 *et seq.;* MSA
28.1285[1] *et seq.).*

OPINION CONCURRING IN PART AND DISSENTING IN PART BY RYAN, J.

6. EXTRADITION — FUGITIVES — CONSTITUTIONAL LAW — STAYS OF
EXECUTION.

*A stay of extradition by a court of an asylum state to permit
fugitives to seek certiorari from the Supreme Court of the
United States to pursue a claim of cruel and unusual punish-
ment in the prisons of the demanding state is unwarranted in
view of the clear precedent of the Supreme Court of the United
States specifically precluding consideration of such claims in
habeas corpus proceedings in the asylum state (US Const, art
IV, § 2; 18 USC 3182; MCL 780.1 et seq.; MSA 28.1285[1] et
seq.).*

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Edward Reilly Wilson,*
Deputy Chief, Civil and Appeals, and *Anne B.
Wetherholt,* Assistant Prosecuting Attorney, for
the people.

*Ashford, Cannon, Lumumba & Shakoor* (by
*Chokwe Lumumba)* for plaintiff Brown.

*Maxwell & Sniderman* (by *Brenda J. Maxwell)*
for defendant Blount.

LEVIN, J. The dispositive issue in these cases is whether a state court in the asylum state, faced with extradition papers proper on their face and a governor's warrant for extradition of an escapee from the demanding state's penal system, may inquire into the constitutionality of prison conditions in the demanding state in passing upon the fugitive's habeas corpus petition. We are obliged by a decision of the United States Supreme Court to hold that it may not, and we therefore affirm the Court of Appeals in both cases.

I

A

Alphonsa Blount was arrested by Detroit police in September, 1974, and charged with being a fugitive from justice from the State of Alabama. Blount had been convicted of armed robbery and, according to his own testimony, sentenced to 45 years in prison. He escaped from Atmore State Prison while accompanying a prison band on a field trip.

On November 19, 1974, a Michigan governor's warrant for Blount's arrest and extradition was issued pursuant to the request of the Governor of Alabama. Blount was arraigned on the warrant before a Recorder's Court Judge, who adjourned the proceedings to permit Blount's attorney to seek a governor's hearing and to prepare a complaint for writ of habeas corpus.

After his request for a governor's hearing was denied, Blount petitioned the Recorder's Court for a writ of habeas corpus, contending *inter alia* that

his right under the Eighth and Fourteenth Amendments[1] to freedom from cruel and unusual punishment would be violated if he were extradited to Alabama. The court denied his application and the Court of Appeals affirmed.

The Recorder's Court Judge stayed extradition while Blount appealed to this Court, which on July 24, 1975, remanded the matter to the trial court "for a hearing on appellant's claim that returning him to the Alabama prison would subject him to cruel and unusual punishment in violation of his Eighth Amendment right."[2]

Witnesses at the hearing on remand included a former inmate of Alabama's Atmore Prison, a Roman Catholic sister who had been active in efforts to promote prison reform in Alabama, the Associate Commissioner of the Alabama Board of Corrections (who had served as warden of all of Alabama's major prisons in the course of his career), and Blount himself.[3] Introduced as exhibits

---

[1] The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The prohibition against cruel and unusual punishments is extended to the states through the Fourteenth Amendment. *Robinson v California,* 370 US 660; 82 S Ct 1417; 8 L Ed 2d 758 (1962).

[2] 394 Mich 825 (1975).

[3] Blount testified that he escaped because his life had been threatened by inmates and guards at Atmore Prison and that he feared for his life if he were returned to Alabama. Blount claimed that he was a founding member of Inmates for Action, a prisoners' group which spoke out in favor of reforms, that only 3 of the 15 founders were still alive, and that he had been told his name appeared on a "death list" in the warden's office.

The Associate Commissioner of the Alabama Board of Corrections testified that Blount was not known to him as a founder or leader of Inmates for Action although several others were, that he knew of two founders who had been killed (both in incidents where guards had also been killed) and knew of others who were alive, and that he knew of no "death list" despite his wide experience in the Alabama prisons.

were opinions and orders entered by federal courts in Alabama in cases involving prison conditions.

In a January 21, 1976, opinion which relied heavily on an opinion issued by an Alabama federal court one week earlier (see part II, below), the judge found that if Blount were returned to Alabama he would be subjected to cruel and unusual punishment. The judge stayed the extradition warrant and adjourned the matter for one year to see whether the Alabama prison system would improve to a point where Blount's extradition "would no longer be prohibited by Eighth Amendment considerations." Blount was placed on personal bond with special conditions.

One year later, when the Wayne County Prosecutor's Office sought to submit a progress report as required by the judge's order, the Alabama authorities did not cooperate in furnishing information regarding improvements in prison conditions. On March 18, 1977, the judge issued a final order quashing the extradition warrant and granting the writ of habeas corpus.

The prosecutor sought an order of superintending control in the Court of Appeals. The Court of Appeals attempted to certify to this Court the question whether the constitutional issues raised by Blount should have been litigated in the courts of Michigan. We denied the request for certification.[4]

In April, 1978, the Court of Appeals set aside the order granting the writ, stating:

"We take judicial notice that changes have been

---

[4] 402 Mich 960 (1978).

mandated by federal court orders and have been implemented in the Alabama penal system since the trial court conducted its hearing. The factual basis for the trial court's findings has therefore altered substantially. We find no impediment to the present return of the fugitive to Alabama for determination in a forum of the demanding state of the present sufficiency or insufficiency of the Alabama prison system."

We granted leave to appeal.[5]

## B

Charles Brown was convicted of armed robbery in Alabama in January, 1974, and was sentenced to 25 years in prison. He was incarcerated at Atmore Prison and escaped from Atmore in June, 1976.

Brown was arrested in Michigan on a fugitive warrant in November, 1977. Alabama requested his return and the Governor of Michigan signed a warrant for his extradition on December 16, 1977. Brown then sought a writ of habeas corpus in Recorder's Court, alleging that he was subjected to cruel and unusual punishment while imprisoned in Alabama and would again be subjected to unconstitutional treatment if returned to that state.

Brown alleges that while in prison he fractured his ankle in three places, but the prison authorities refused to provide him with immediate medical treatment and required him to perform his normal work assignment for two days before treating his injury. He filed an action in an Alabama federal court against the prison and two officers and was informed by a prison guard that if he prevailed, he would not live to collect the money damages. The inmate who helped him prepare his

[5] 406 Mich 892 (1979).

pleadings was severely beaten, allegedly in connection with his having helped Brown.

The Recorder's Court denied Brown's petition on the basis of the Court of Appeals decision in Blount's case, and the Court of Appeals dismissed an original complaint in that Court for a writ of habeas corpus. We granted leave to appeal.[6]

## II

Eight days before the trial court issued its opinion in *Blount,* a United States district court in Alabama decided two consolidated class actions filed on behalf of inmates incarcerated in Alabama prisons. *Pugh v Locke,* 406 F Supp 318 (MD Ala, 1976). The judge's opinion graphically described the severe inadequacies of Alabama's prisons:[7]

"There can be no question that the present conditions of confinement in the Alabama penal system violate any current judicial definition of cruel and unusual punishment, a situation evidenced by the defendants' admission that serious Eighth Amendment violations exist. In these circumstances, it is the very confinement itself which impermissibly contravenes the Eighth and Fourteenth Amendment rights of the plaintiff classes.

\* \* \*

"The conditions in which Alabama prisoners must live, as established by the evidence in these cases, bear no reasonable relationship to legitimate institutional goals. As a whole they create an atmosphere in which inmates are compelled to live in constant fear of vio-

---

[6] 406 Mich 892 (1979).

[7] The judge noted that he had considered "depositions, exhibits, photographs, briefs and over 1,000 stipulated facts" and the testimony offered during a seven-day trial which "concluded with the admission by defendants' lead counsel, in open court, that the evidence conclusively established aggravated and existing violations of plaintiffs' Eighth Amendment rights". *Pugh v Locke,* 406 F Supp 318, 322 (MD Ala, 1976).

lence, in imminent danger to their physical well-being, and without opportunity to seek a more promising future.

"The living conditions in Alabama prisons constitute cruel and unusual punishment. Specifically, lack of sanitation throughout the institutions—in living areas, infirmaries, and food service—presents an imminent danger to the health of each and every inmate. Prisoners suffer from further physical deterioration because there are no opportunities for exercise and recreation. Treatment for prisoners with physical or emotional problems is totally inadequate. This court has previously ordered that the penal system provide reasonable medical care for inmates in these institutions * * *. *Newman v Alabama,* 349 F Supp 278, 285-286 (MD Ala, 1972). The evidence in these cases leads to the inescapable conclusion that the gross inadequacies in medical care found in that case have not been remedied.

"Prison officials are under a duty to provide inmates reasonable protection from constant threat of violence.

*      *      *

"The evidence establishes that inmates are housed in virtually unguarded, overcrowded dormitories, with no realistic attempt by officials to separate violent, aggressive inmates from those who are passive or weak. The tension generated by idleness and deplorable living conditions contributes further to the ever-present threat of violence from which inmates have no refuge.

*      *      *

"The response of the defendants to the matters set forth in this opinion consistently has been that they cannot alleviate the conditions because of inadequate funding by the state legislature. However, a state is not at liberty to afford its citizens only those constitutional rights which fit comfortably within its budget. The Alabama Legislature has had ample opportunity to make provision for the state to meet its constitutional responsibilities in this area, and it has failed to do so." 406 F Supp 329-330.

The United States district court established specific "minimum constitutional standards" relating to overcrowding, segregation and isolation units,

classification of inmates, mental health care, protection of inmates from violence, general living conditions, food service, physical plants, prison staff, inmates' correspondence and visitation, and opportunities for education, vocational training, work and recreation. The Alabama prison system was ordered not to accept new prisoners until the inmate population had been reduced to the design capacity for each facility.

In September, 1978, the district court held hearings to determine the degree of compliance with its orders. On February 2, 1979, the judge issued an opinion which surveyed Alabama's efforts at compliance and concluded that there had been a disturbing lack of progress.

"The very fact of confinement in Alabama's penal system continues to contravene the Eighth and Fourteenth Amendment rights of plaintiffs.

\* \* \*

"Time does not stand still, but the Board of Corrections and the Alabama prison system have for six years. Their time has now run out. The court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the court in this case. Plaintiffs are entitled to prompt and effective relief. Living conditions that constitute an imminent danger to health; inadequate medical care that poses a threat to life; and insufficient security that sanctions the law of the jungle—these facts describe a state of emergency demanding decisive action. It is clear that the Board of Corrections is incapable of effective leadership. Difficult as the board's position was made by the lack of adequate funding, the court finds that the board could have ameliorated the conditions confronting it, but instead contributed to the gravity of the situation by its indifference and incompetence. The lack of any significant progress since the original hearings in this case strongly suggests that the appointment of monitors offers little, if any, hope of swift compliance. The ex-

traordinary circumstances of this case dictate that the only alternative to non-compliance with the court's orders is the appointment of a receiver for the Alabama prisons." *Newman v Alabama,* 466 F Supp 628, 630, 635 (MD Ala, 1979).[8]

Newly elected Alabama Governor Fob James was appointed receiver. Despite the good intentions expressed in his petition for appointment,[9] and in quarterly compliance reports submitted under his supervision since his appointment, it appears that upgrading of the Alabama prison system has been a slow and uneven process. While considerable progress has been made in some administrative areas, little progress has been made toward the basic goal of providing adequate and habitable housing for all inmates. On July 15, 1981, the judge's successor[10] issued an unpublished injunctive order directing the release of a number of inmates to help alleviate continued overcrowding:[11]

"It is agreed by all parties that the Alabama Department of Corrections is still out of compliance with the standards established by this court in *Newman v Alabama, supra,* and in *Pugh v Locke, supra.* It is further stipulated by all parties that most of the terms of the said orders should have been met long before now and

[8] *Newman v Alabama,* a prior class action challenging the lack of medical care in Alabama's prisons, was consolidated with *Pugh v Locke* and its companion case, *James v Wallace,* after issuance of the judge's 1976 opinion in *Pugh.*

[9] 466 F Supp 636-639.

[10] The United States district judge who issued the first opinions in that cause was Frank M. Johnson, Jr. Judge Robert E. Varner succeeded him when he was elevated to the United States Court of Appeals.

[11] A new facet of the overcrowding problem was the necessity of housing some state inmates in city and county jails because the court's order in *Pugh v Locke* restricted admission of inmates in excess of the prisons' rated capacities.

that full compliance must ultimately be achieved. * * *
[T]his court has attempted to provide every possible
opportunity for the defendants to achieve compliance
with both state law and the orders of this court within
the last nine years.

"During this time, the State Department of Correc-
tions has been continuously in direct violation of the
orders of this court, and present plans for expansion are
insufficient to relieve the condition. On October 9, 1980,
this court ordered that by March 1, 1981, there would
be no more than 960 state inmates incarcerated in city
or county jails in Alabama. On May 18, 1981, there
were 1,606 state prisoners confined in city and county
jails in Alabama. At present, there are over 2,100 state
inmates in city and county facilities. * * *

"Therefore, because of the failure of those empowered
to fund needed construction, this court has a duty to
fashion relief to protect constitutional rights of citizens.
*Hutto v Finney,* 437 US 678, 687; 98 S Ct 2565; 57 L Ed
2d 522 (1978). * * * This court is of the opinion that the
constitutional rights of the plaintiff class are in jeop-
ardy and that any substantial continuation of the incar-
ceration of state inmates in city and county facilities
under conditions and circumstances now current would
probably violate their constitutional immunity to cruel
and unusual punishment. To avoid this result, this
court is of the opinion that the only valid substantial
relief available to 'insure against the risk of inadequate
compliance' (see *Hutto v Finney, supra,* at 687) is the
release of a substantial number of inmates to help
relieve the overcrowded conditions of the Alabama
prison system."

The court ordered that 400 prisoners, later re-
duced to 277, be released. On July 25, Alabama
released them outright.[12]

The plaintiffs, however, continued to be dissatis-
fied with the overcrowding and requested the re-
lease of more prisoners. On December 14, 1981,
the court through an injunction ordered the re-

---

[12] See *Newman v Alabama,* 683 F2d 1312, 1316 (CA 11, 1982).

lease of 352 prisoners on parole. The United States
Court of Appeals for the Eleventh Circuit stayed
this order pending appeal. On appeal, the Court of
Appeals considered both the July and December
injunctions, but dismissed the appeal of the July
order as moot.[13] The court vacated the December
order:

"In summary, the district court erred in entering the
December 14 injunction since the plaintiffs possessed an
adequate legal remedy in the form of the October 9,
1980, consent order which was enforceable through the
court's contempt power. Even if the issuance of an
injunction had been warranted on December 14, the
district court abused its discretion by framing relief
which was impermissibly intrusive on the State's pre-
rogative to administer its prison and parole systems."
683 F2d 1321.

The plaintiffs have since applied to have Ala-
bama's governor, in his capacity as receiver of the
prison system, attorney general, and commissioner
of the Board of Corrections fined or imprisoned for
contempt because of their failure to adhere to the
consent decree. A hearing on that application is
scheduled for January, 1983.[14]

---

[13] See 683 F2d 1316-1317.

[14] In preparation for the contempt proceedings, one of the amici
curiae prepared tables comparing the incidence of reported violence
in Alabama's major prison facilities during comparable periods in
1980 and 1982. The tables summarize records of the prison system
and are part of the record in the cause. These tables indicate that an
Alabama prisoner faces at least as much physical danger now as in
1980 when the consent decree was filed. We reproduce the portions of
the tables reporting the totals for Alabama's major prison facilities,
omitting the analysis by facility.

*"TABLE 1*
"Comparison of numbers of incidents of reported violence during
the periods of January 1 through September 9, 1980, and January 1
through September 30, 1982 (approx.), in Alabama's major prison
facilities.

|  |  | *Total* |
|---|---|---|
| "Homicide[4] | 1980 = | 2 |
|  | 1982 = | 1 |

| | | |
|---|---|---|
| "Assault with a weapon[5] | | 92 / 80 |

"Assault with a weapon[5]     92 / 80

"Assault without a weapon[6]     128 / 295

"Assaults on officers[7]     44 / 87

"Threats on officers[8]     37 / 22

"Threats[9]     18 / 17

"Rapes[10]     N/A / 1

"Sexual misconduct[11]     8 / 32

"Total     1980 = / 1982 =     329 / 535"

Table 1 Footnotes:

"[4] DOC [Department of Corrections] Code 111.

"[5] DOC Code 121—includes 'fighting with a weapon'.

"[6] DOC Code 122 & 123—includes 'fighting without a weapon', 'assault on inmate', 'fighting', 'assault'.

"[7] DOC Code 126 & 129.

"[8] DOC Code 127—includes 'threatening an officer's life', 'attempted assault'.

"[9] DOC Code 124—includes 'verbal threats', 'harassment', 'threatening an inmate', 'threatening the life of an inmate'.

"[10] DOC Code 141.

"[11] DOC Code 142, 143 & 144—includes 'sexual offense', 'sodomy', 'non-forcible sexual offense', 'sexual offense—forcible'."

"*TABLE 2*

"Comparison of numbers of prisoners charged or suspected of being involved in incidents of violence during the periods of January 1, 1980, through September 9, 1980, and January 1, 1982, through September 30, 1982 (approx.), in Alabama's major prison facilities.

*Total*

"Homicide     1980 = / 1982 =     2 / 0

"Assault with a weapon     144 / 204

"Assault without a weapon     228 / 529

It appears that conditions in the Alabama penal system even now fail to comport with the Eighth Amendment; at least there is no reason to suppose that such progress has been made that it can no longer be properly said, as the district court declared on February 2, 1979:

"The very fact of confinement in Alabama's penal system continues to contravene the Eighth and Fourteenth Amendment rights of plaintiffs."

### III

The United States Constitution provides: "A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." US Const, art IV, § 2, cl 2. The courts of an asylum state are bound by this federal constitutional provision, by the implementing federal statute, 18 USC 3182, and, where adopted, by the Uniform Criminal Extradition Act.[15] *Michigan v Doran,* 439 US 282,

| | |
|---|---|
| "Assault on officers | $\frac{44}{93}$ |
| "Threats on officers | $\frac{37}{22}$ |
| "Threats | $\frac{18}{26}$ |
| "Rapes | $\frac{N/A}{4}$ |
| "Sexual misconduct | $\frac{8}{60}$ |
| "Total    1980 = | 481 |
|          1982 = | 938" |

[15] The Uniform Criminal Extradition Act has been adopted in Michigan. MCL 780.1 *et seq.;* MSA 28.1285(1) *et seq.*

288-289; 99 S Ct 530; 58 L Ed 2d 521 (1978).

After these cases were argued and submitted, the United States Supreme Court decided *Pacileo v Walker,* 449 US 86; 101 S Ct 308; 66 L Ed 2d 304 (1980), *reh den* 450 US 960; 101 S Ct 1421; 67 L Ed 2d 385 (1981). In *Pacileo,* James Dean Walker, an escapee from the prisons of Arkansas, was apprehended in California. The Governor of Arkansas requested Walker's extradition, and the Governor of California honored the request and issued a warrant of arrest and rendition which was served upon Pacileo, the California sheriff in whose custody Walker was lodged.

Walker petitioned for habeas corpus relief in both state and federal courts in California, but was unsuccessful until he reached the Supreme Court of California. On April 9, 1980, that court issued a writ of habeas corpus directing a California trial court to " 'conduct hearings to determine if the penitentiary in which Arkansas seeks to confine petitioner is presently operated in conformance with the Eighth Amendment of the United States Constitution and thereafter to decide the petition on its merits' ". 449 US 87.

On December 8, 1980, the United States Supreme Court, without setting the case for argument, reversed in a per curiam opinion, the substantive portion of which is herewith quoted in full:

*"Petitioner Sheriff contends that Art IV, § 2, cl 2, and its implementing statute, 18 USC 3182, do not give the courts of the 'asylum' or 'sending' State authority to inquire into the prison conditions of the 'demanding' state. We agree. In Michigan v Doran, 439 US 282; 99 S*

Ct 530; 58 L Ed 2d 521 (1978), our most recent pronouncement on the subject, we stated that '[i]nterstate extradition was intended to be a summary and mandatory executive proceeding derived from the language of Article IV, § 2, cl 2 of the Constitution.' *Id.,* 288. We further stated that:

" 'A governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met * * *. Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable.' *Id.,* 289.

"In *Sweeney v Woodall,* 344 US 86; 73 S Ct 139; 97 L Ed 114 (1952), this Court held that a fugitive from Alabama could not raise in the federal courts of Ohio, the asylum State, the constitutionality of his confinement in Alabama. We stated:

" 'Considerations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by Alabama in the courts of that State. Respondent should be required to initiate his suit in the courts of Alabama, where all parties may be heard, where all pertinent testimony will be readily available, and where suitable relief, if any is necessary, may be fashioned.' *Id.,* 90.

"We think that the Supreme Court of California ignored the teachings of these cases when it directed one of its own trial courts of general jurisdiction to conduct an inquiry into the present conditions of the Arkansas penal system. *Once the Governor of California issued the warrant for arrest and rendition in response to the request of the Governor of Arkansas, claims as to constitutional defects in the Arkansas penal system should be heard in the courts of Arkansas, not those of California.* 'To allow plenary review in the asylum state of issues that can be fully litigated in the charging state would defeat the plain purposes of the summary and mandatory procedures authorized by Art IV, § 2.' *Michi-*

*gan v Doran,* 439 US 290." 449 US 86, 87-88. (Emphasis supplied.)

Justice Marshall alone dissented, stating that he would set the case for plenary review because he did not believe that *Doran* and *Sweeney* controlled the question presented.

Our pre-*Doran* order remanding *Blount* to the trial court for an evidentiary hearing plainly contemplated that a habeas corpus court in the asylum state could engage in more than formalistic review and could, indeed, quash a governor's extradition warrant on the ground that returning the fugitive to the demanding state would result in a deprivation of his constitutional rights under the Eighth and Fourteenth Amendments. We might not have felt compelled to abandon that view by the dictum of *Doran,* since the issue there was whether the courts of the asylum state could, despite an executive grant of extradition, re-evaluate a determination of probable cause made by a judicial officer in the demanding state. Unlike Doran, Brown and Blount do not ask an asylum state court to re-examine a pre-trial inquiry already carried out in the demanding state.

*Sweeney v Woodall, supra,* bears a greater resemblance to the present case but could also be distinguished. Woodall, an escapee from an Alabama prison, resisted extradition on the ground that he had been brutally mistreated during his confinement in Alabama and that the similar or worse treatment to which he would be subjected if returned would amount to cruel and unusual punishment in violation of his constitutional rights. After the Ohio state courts refused to entertain his claim, Woodall sought habeas corpus in the federal courts. The United States Court of Appeals for the Sixth Circuit directed the district court, which had

dismissed the petition, to conduct a hearing on the merits of the constitutional claim. The Supreme Court reversed, saying:

"In the present case, as in [other cases cited by the Court], a fugitive from justice has asked the federal court in his asylum to pass upon the constitutionality of his incarceration in the demanding state, although the demanding state is not a party before the federal court and although he has made no attempt to raise such a question in the demanding state. The question is whether, *under these circumstances,* the district court should entertain the fugitive's application on its merits.

"*Respondent makes no showing that relief is unavailable to him in the courts of Alabama.* Had he never eluded the custody of his former jailers he certainly would be entitled to no privilege permitting him to attack Alabama's penal process by an action brought outside the territorial confines of Alabama in a forum where there would be no one to appear and answer for that State. * * *

"By resort to a form of 'self help', respondent has changed his status from that of a prisoner of Alabama to that of a fugitive from Alabama. But this should not affect the authority of the Alabama courts to determine the validity of his imprisonment in Alabama. The scheme of interstate rendition as set forth in both the Constitution and the statutes which Congress has enacted to implement the Constitution, contemplates the prompt return of a fugitive from justice as soon as the state from which he fled demands him; these provisions do not contemplate an appearance by Alabama in respondent's asylum to defend against the claimed abuses of its prison system." 344 US 88-90. (Emphasis supplied; footnotes omitted.)

Three concerns are apparent in the Court's opinion in *Sweeney:* (1) principles of federalism and comity demand that the courts of the state which has allegedly subjected a prisoner to unconstitutional conditions of confinement be given an oppor-

tunity to pass upon his claim; (2) requiring a state to defend its prison system in the courts of a sister state would be burdensome to the state required to defend; (3) a prisoner should gain no greater access to legal remedies through escape.

The first two concerns are inapposite where, as here, a United States district court in the demanding state has ruled that conditions in its prisons violate the Eighth Amendment.

Extensive hearings in the courts of the asylum state would not be necessary to determine whether returning the fugitive to the demanding state would subject him to a violation of his constitutional rights, for a court in the demanding state has already determined the question in a proceeding in which the state authorities have had every opportunity to defend themselves in a convenient forum. In *Blount,* for example, the trial court's decision to grant the writ of habeas corpus rested not upon the record made at the evidentiary hearing, which became almost superfluous, but almost entirely upon the determinations made by the United States district court on a substantial record which included Alabama's admission that conditions in its prisons violated constitutional guarantees.

The argument that a fugitive should not be able to improve his position through escape is not easily answered. To be sure, Brown and Blount have placed themselves in a favored position in relation to other prisoners who remain incarcerated under unconstitutional conditions. But this Court is not responsible for the Eighth Amendment violations existing in the Alabama prisons. We are, however, responsible for the future treatment of Blount and Brown. We are asked in effect to prevent an act, extradition, which is necessary for

Alabama to subject them to cruel and unusual punishment. The only question before us is whether we will act to facilitate that mistreatment.

This Court thus rests squarely on the horns of a moral dilemma. Are we compelled by our role as a part of the federal system to adhere to a rule which we perceive to have been articulated without exception by the federal courts, although the concerns underlying that rule apply with less force in this case and its application will almost certainly result in deprivations of constitutional rights? Can considerations of comity and efficiency lead this Court to act when Alabama's noncompliance with the Constitution has already been determined by a United States district court sitting in that state?

We conclude that we are obliged by *Pacileo* to hold that a habeas corpus court in the asylum state is limited to the minimal review described therein, and that the petitions for habeas corpus filed by Blount and Brown must therefore be denied. *Pacileo* reaffirms in a context parallel to the present one *Doran's* prescription of an extremely narrow role for the courts of the asylum state, a role which in effect reserves to the demanding state adjudication of all of a petitioner's claims that his legal or constitutional rights have been violated or will be violated by his return. The United States Supreme Court appears resolved to construe the Extradition Clause in accordance with the principles sketched in *Doran, supra,* 439 US 287-288:

"The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkanize' the administration of criminal justice among the several states. It articulated,

in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art IV. The Extradition Clause, like the Commerce Clause, served important national objectives of a newly developing country striving to foster national unity. * * * In the administration of justice, no less than in trade and commerce, national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy."

Recognizing the importance of comity and full faith and credit and of avoiding "balkanization" of the administration of criminal justice, we regret that those important interests cannot, in an appropriate case, be outweighed by the right of an individual human being to be free from cruel and unusual punishment.

Our reading of *Pacileo* indicates that the United States Supreme Court is not disposed to allow an asylum state court even to consider a present finding of unconstitutionality made by a court domiciled in the demanding state,[16] but will re-

[16] The demanding state in *Pacileo* was Arkansas, where Walker had escaped from prison in 1975. He was captured in California in 1979 and the Governor of California issued the warrant in early 1980. See 449 US 86-87.

The conditions of confinement in Arkansas prisons were first found unconstitutional in *Holt v Sarver*, 300 F Supp 825 (ED Ark, 1969) and 309 F Supp 362 (ED Ark, 1970), aff'd 442 F2d 304 (CA 8, 1971). In *Finney v Hutto*, 410 F Supp 251 (ED Ark, 1976), the United States district court found that constitutional violations persisted. The United States Court of Appeals for the Eighth Circuit affirmed, 548 F2d 740 (1977), as did the United States Supreme Court on the narrow issues presented to it. 437 US 678; 98 S Ct 2565; 57 L Ed 2d 522 (1978). In late 1978, after the Supreme Court opinion, the parties entered into a consent decree resolving the issues in the lawsuit. *Finney v Mabry*, 458 F Supp 720 (ED Ark, 1978). It does not appear that findings of unconstitutional conditions were entered in the cause subsequent to the 1976 district court opinion, nor have there been any published opinions concerning efforts to enforce the 1978 consent decree, although the plaintiffs are apparently still monitoring the state's adherence to the decree and raising new claims. See *Chambers v Kaplan*, 648 F2d 1193 (CA 8, 1981) (per curiam); *Finney v Mabry*, 528 F Supp 567 (ED Ark, 1981).

quire a fugitive named in an extradition warrant and charged with a crime in the demanding state to pursue his tenuous remedy[17] in courts located in the demanding state.

## IV

However, in recognition of the possibility that we have incorrectly interpreted the guidance offered by the United States Supreme Court, we stay execution of the extradition warrants for Brown and Blount[18] until either (1) the appropriate time for filing of a petition for certiorari with the United States Supreme Court has elapsed without such a petition having been filed; or (2) the United States Supreme Court denies a timely filed petition for certiorari.

Affirmed.

FITZGERALD, C.J., and KAVANAGH and WILLIAMS, JJ., concurred with LEVIN, J.

RYAN, J. *(concurring in part and dissenting in part).* I am in total agreement with my colleague that *Pacileo v Walker,* 449 US 86; 101 S Ct 308; 66 L Ed 2d 304 (1980), *reh den* 450 US 960; 101 S Ct 1421; 67 L Ed 2d 385 (1981), requires the affirmation of the decisions of the Court of Appeals below resulting in the denial of writs of habeas corpus for the defendants. As he has noted, the United States Supreme Court has found that a state court

In the instant case, there is a district court order of December, 1981, releasing prisoners due to unconstitutional conditions in the Alabama prison system and a pending contempt proceeding concerning the state's failure to correct those constitutional violations. See fns 12 and 14 *supra.*

[17] The litigation commenced in Alabama prior to 1972 does not appear to have brought about any significant change in the living conditions in Alabama prisons.

[18] The stay will also apply to any cases held in abeyance pending our decision in the instant case.

in the asylum state may not inquire into the constitutional defects of the prison system of the demanding state once a claim of extradition has properly been made upon the asylum state.

However, I dissent from the inherent criticism of the Supreme Court's decision in *Pacileo* that it failed to recognize an exception to the clear mandate of article IV, § 2, cl 2 of the Constitution of the United States requiring a state to deliver a fugitive from justice to the state from which he fled upon demand. The *Pacileo* Court considered both the language of the Extradition Clause and the policies behind it clearly determining uniformity in application to be appropriate. Even assuming the principles of federalism and comity and the interest in allowing a state to defend its prison system in its own courts, where it would be least burdensome to it, are minimal, the prevention of the "balkanization" of the administration of criminal justice is the manifest purpose of the Extradition Clause. See *Michigan v Doran,* 439 US 282; 99 S Ct 530; 58 L Ed 2d 521 (1978). We cannot say that the defendant's constitutional rights will not be vindicated, particularly in this case where the federal court has taken an active role in ensuring constitutional compliance. See *Pugh v Locke,* 406 F Supp 318, 322 (MD Ala, 1976).

Second, I dissent from the gratuitous stay my colleagues allow. In light of the Supreme Court's recent decision on point, ·its denial of a rehearing, and the fact that *Pacileo* was based on what the Court considered to be clear precedent as much as thirty years old, *Sweeney v Woodall,* 344 US 86; 73 S Ct 139; 97 L Ed 114 (1952), a stay in order that the appellants might remain in this state until they can challenge *Pacileo* is totally unwarranted. It amounts to an affront to the United States

Supreme Court. It has not been requested by the appellants and does not rest, in my judgment, upon any reasonable belief that "we may have incorrectly interpreted" *Pacileo.*

COLEMAN, J., concurred with RYAN, J.

RILEY, J., took no part in the decision of these cases.