**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARCIANO PLATA; RALPH COLEMAN,
          *Plaintiffs-Appellees,*

J. CLARK KELSO,
          *Receiver,*

      v.

ARNOLD SCHWARZENEGGER,
Governor; MICHAEL GENEST; JAMES
E. TILTON,
          *Defendants-Appellants.*

No. 09-15864

D.C. No.
3:01-cv-01351-TEH

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

Argued and Submitted
September 16, 2009—San Francisco, California

Filed April 30, 2010

Before: Mary M. Schroeder, William C. Canby, Jr. and
Michael Daly Hawkins, Circuit Judges.

6435

## COUNSEL

Rebekah Evenson, Prison Law Office, Berkeley, California, for the plaintiffs-appellees.

George C. Harris, Morrison & Foerster LLP, San Francisco, California, for the receiver.

Paul B. Mello, Hanson Bridgett LLP, San Francisco, California, for the defendants-appellants.

---

## OPINION

CANBY, Circuit Judge:

This class action was brought by California prisoners to challenge deficiencies in prison medical care that allegedly violated the Eighth Amendment and the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213. The parties consented to the entry of stipulated orders providing steps to remedy the deficiencies. When the State was unable to comply with the consent orders, the court imposed a receivership on the California Department of Corrections and Rehabilitation ("CDCR") to administer and improve prisoner health care.

Although the State did not oppose or appeal from the appointment of the Receiver, it now seeks, after several years, to terminate the receivership on the ground that the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA" or "Act"), deprived the district court of the power to appoint a receiver in prison litigation. In addition, the State contends that the receivership was not "the least intrusive means necessary to correct the violation of the Federal right," as the Act requires the district court to find in granting prospective relief. *Id.* § 3626(a)(1)(A). Finally, the State challenges the Receiver's

planning for construction of additional prison facilities on the ground that the Act implicitly prohibits such planning.

We conclude that the Act does not deprive the district court of its equitable power to appoint a receiver in prison litigation. We also reject the State's challenge to the district court's finding that a receivership was the least intrusive means of remedying constitutional violations in prisoner health care. Finally, we conclude that we lack jurisdiction to review the district court's refusal to terminate the Receiver's construction plan. We accordingly affirm the portion of the district court's order that denied the State's motion to terminate the receivership, and we dismiss the appeal of the portion rejecting the challenge to the Receiver's construction planning.

## I.   Background

The plaintiffs brought this action on behalf of all inmates of California state prisons. The complaint alleges that the State has provided inmates with inadequate medical care in violation of the Eighth Amendment and the Americans with Disabilities Act.[1] In January 2002, after almost three years of informal negotiations and prior to discovery or any ruling on the part of the court, the parties entered into a "Stipulation and Order for Injunctive Relief" ("Relief Order") designed to remedy the alleged violations. The court approved the Relief Order that June.

As part of the Relief Order, the State agreed to implement specific remedial procedures to ensure the provision of constitutionally adequate medical care in prisons statewide. These

---

[1]This case is one of four pending class actions concerning the provision of constitutionally inadequate medical care in California state prisons. The other three are *Coleman v. Schwarzenegger*, Nos. 2:90-cv-00520 (E.D. Cal.) (mental health care); *Perez v. Cate*, No. 3:05-cv-05241 (N.D. Cal.) (dental care); and *Armstrong v. Schwarzenegger*, No. 4:94-cv-02307 (N.D. Cal.) (compliance with the Americans with Disabilities Act).

measures were to be taken on a rolling basis with seven prisons implementing the procedures in 2003 and five additional prisons implementing them each year through 2008. The Relief Order provides that it shall be "binding upon, and faithfully kept, observed, performed and be enforceable by and against the parties" and empowers the district court to enforce its terms through "specific performance and all other remedies permitted by law." In accord with this authorization, the district court convened monthly status conferences, toured one of the subject prisons, enlisted experts to monitor compliance with the Relief Order, and encouraged the parties to devise a joint plan for attaining the goals of the Relief Order. The going was slow. In September 2004, after two years of little progress, the parties entered into a Stipulated Order Regarding the Quality of Patient Care and Staffing ("Care Order"), which the court promptly approved. This Care Order was meant to ensure the competency of medical staff and to establish procedures for the identification and treatment of high-risk patients.

Three years after entering into the consent decree, not a single prison had successfully implemented the remedial procedures, despite the fact that a "significant number" of inmates had died as a direct result of substandard medical care—a fact the State openly acknowledges. Reckoning that the medical delivery system was "too far gone to be corrected by conventional methods," the district court issued an order directing the State to show cause as to why it should not be held in contempt for failing to comply with prior orders and, also, why the court should not appoint a receiver to manage the delivery of constitutionally adequate medical care in state prisons.

Because the Relief Order was the product of a settlement, attained without findings of fact, the district court conducted a six-day evidentiary hearing on the order to show cause. At the hearing, the court received dozens of exhibits into evidence and took testimony from various experts and state employees. Numerous experts testified as to the "incompe-

tence and indifference" of prison physicians and medical staff and described an "abysmal" medical delivery system where "medical care too often sinks below gross negligence to outright cruelty." Despite such damning revelations, the State let the reports and testimony of those experts go, in the words of the court, "essentially uncontested." Indeed, the State candidly admitted in its response to the order to show cause "that to date [it had] failed to attain compliance with all aspects of [prior] Court Orders."

In October 2005, after briefing by the parties and amici curiae, the district court issued its findings of fact and conclusions of law regarding the order to show cause. After cataloguing "extensive and disturbing" constitutional violations in the delivery of medical care to inmates, the court declared its intention to hold the citation for contempt in abeyance and to establish a receivership to remedy the violations. Echoing the PLRA, *see* 18 U.S.C. § 3626(a)(1)(A), the court found that the receivership and "those actions necessary to effectuate its establishment, are narrowly drawn to remedy the constitutional violations at issue, extend no further than necessary to correct a current and ongoing violation of a federal right, and are the least intrusive means necessary to correct these violations." "[I]f the system is not dramatically overhauled," the court observed, an "unconscionable degree of suffering and death is sure to continue."

In February 2006, the district court issued an order appointing a Receiver and conferring upon the Receiver all of the powers of the Secretary of the CDCR with respect to the delivery of medical care, while concurrently suspending the Secretary's exercise of the same. Notwithstanding the "unprecedented . . . scope and dimension" of the receivership, as noted by the court, the State neither objected to nor appealed the order*See* 28 U.S.C. § 1292(a)(2) (authorizing appeals from "[i]nterlocutory orders appointing receivers"). Among other things, the order requires that all costs related to the receivership be borne by the State and directs the Receiver to

prepare a "Plan of Action" for remedying the constitutional violations and to file regular progress reports with the court.

In May 2007, the Receiver filed a draft Plan of Action calling for the construction of 10,000 new beds and a motion to modify the original stipulated orders to accommodate "the changed circumstances reflected by the need for [the Receiver's] appointment, and in order to facilitate implementation of the [Plan of Action]." *Plata v. Schwarzenegger*, 560 F.3d 976, 979 (9th Cir. 2009) (alteration in original) (internal quotation marks omitted). California's response was to join the motion, which the district court subsequently granted. Over the course of the next fourteen months, the Receiver filed numerous motions and revised plans of action, many of which concerned the construction of new facilities and all of which, until mid-2008, met with the approval or acquiescence of the State. *Id.* at 979-80.

In July 2008, the Receiver requested $204.6 million in previously appropriated funds from the State for the implementation of its final, court-approved plan of action. *Id.* at 980. When the State denied its request, the Receiver moved the district court to cite State defendants Schwarzenegger and Chiang for contempt of court for failing to transfer the funds. *Id.* Following the submission of briefs and a hearing, in which the State averred that it was "unable to provide any of the unencumbered [previously appropriated] funds to the Receiver," the court issued an order directing the State to transfer $250 million to the Receiver no later than November 5, 2008, or risk being cited for contempt. *Id.* (alteration in original) (internal quotation marks omitted). The State appealed the order, but, in March 2009, we dismissed the appeal as non-final because further proceedings relating to the contempt were clearly contemplated. *Id.* at 982.

Meanwhile, in January 2009, the State had filed in district court the motion that is the subject of this appeal. The State moved to end the receivership and replace the Receiver with

a special master. The motion also sought to terminate the Receiver's construction plan. The State contended that, as a matter of law, the PLRA barred the district court from both appointing a receiver and "ordering the construction of prisons." The Receiver made two requests of the district court: first, that it convene an evidentiary hearing on the Motion to Terminate, and, second, that the district court grant it leave to conduct limited discovery regarding certain factual issues implicated in the motion. The State opposed the requests, arguing that the Motion to Terminate was "based on the plain language of the PLRA and present[ed] discrete legal questions" and, therefore, could be decided without an evidentiary hearing.

Observing that the State sought to terminate the receivership on purely legal grounds, the district court denied without prejudice the Receiver's request to schedule an evidentiary hearing, and denied as premature the Receiver's request to conduct limited discovery. Three weeks later, the district court issued an order denying the entire Motion to Terminate, which the State now appeals.

## II.  Standards of Review

"We review de novo the district court's construction or interpretation of a statute." *United States v. Carranza*, 289 F.3d 634, 642 (9th Cir. 2002). We review mixed questions of law and fact for clear error when the factual issues predominate. *See Tolbert v. Page*, 182 F.3d 677, 681-85 (9th Cir. 1999) (en banc).

## III.  Discussion

  A.  The PLRA Does Not Bar the Appointment of
      Receivers in Prison Litigation.

The heart of the State's argument is that the PLRA implicitly bars the district court from appointing a receiver because

it provides for the appointment of a special master. The State relies on the general intent of the PLRA to limit judicial intervention into prison management, and contends that the Act's provision for a special master must be read to exclude the appointment of receivers.

**[1]** Certainly nothing in the PLRA expressly prohibits the appointment of a receiver. Receiverships were far from unknown in prison litigation before the enactment of the PLRA in 1990. The best known example was the appointment by Chief Judge Frank Johnson of a receiver (the state governor) to oversee the entire Alabama prison system. *See New-man v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979). Other receivers were employed to govern city or county jails or jail systems. *See Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) (jail's medical and mental health services); *Shaw v. Allen*, 771 F. Supp. 760, 763-64 (S.D. W. Va. 1990) (county jail); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d 549, 560-61 (Mich. Ct. App. 1989) (county jail system). Receiverships were also a recognized tool for taking over other governmental agencies that could not or would not comply with the law. *See Morgan v. McDonough*, 540 F.2d 527, 532-34 (1st Cir. 1976) (school desegregation); *Gary W. v. Louisiana*, Civ. A. No. 74-2412, 1990 WL 17537, at *30-33 (E.D. La. Feb. 26, 1990) (state children's services agencies); *Turner v. Goolsby*, 255 F. Supp. 724, 730 (S.D. Ga. 1966) (county school system); *Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of Dep't of Mental Retardation*, 677 N.E.2d 127, 150 (Mass. 1997) (Department of Mental Retardation), *abrogated on other grounds by In re Birchell*, 913 N.E.2d 799, 813 (Mass. 2009).

**[2]** There can be little question, therefore, that receiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws. The State accordingly has a high burden in attempting to show that the PLRA revoked this power by implication. In *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000), we

recognized "the principle that a statute should not be construed to displace courts' traditional equitable powers '[a]bsent the clearest command to the contrary.' " *Id.* at 997 n.12 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979)) (alteration in *Gilmore*).

> [T]he comprehensiveness of . . . equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). We find no such clear command or inescapable inference in the PLRA.

**[3]** The provisions of the PLRA on which the State focuses are codified at 18 U.S.C. § 3626(f) and (g), which provide in pertinent part:

> (f)  Special masters.—
>
>> (1)  In general.—(A) In any civil action in a Federal court with respect to prison conditions, the court may appoint a special master who shall be disinterested and objective and who will give due regard to the public safety, to conduct hearings on the record and prepare proposed findings of fact.
>>
>> . . . .
>>
>> (6)  Limitations on powers and duties.—A special master appointed under this subsection—

  (A) may be authorized by a court to conduct hearings and prepare proposed findings of fact, which shall be made on the record;

  (B) shall not make any findings or communications ex parte;

  (C) may be authorized by a court to assist in the development of remedial plans; and

  (D) may be removed at any time, but shall be relieved of the appointment upon the termination of relief.

 (g) Definitions.—As used in this section—

  . . . .

  (8) the term "special master" means any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court . . . .

18 U.S.C. § 3626(f)-(g). These provisions clearly authorize the appointment of a special master in prison litigation to hold hearings, make recommended findings, and perform certain other related functions. They do not, however, provide that the court may appoint a special master with these powers and *no one else*. Nor does anything in § 3626(f) or (g) purport to address the quite different office of a receiver, appointed by

the court to take over the day-to-day management of a prison system or a segment of it.[2]

The State invokes, however, the canon of *expressio unius est exclusio alterius*, arguing that, by providing for special masters, Congress implicitly negated the appointment of receivers. But that canon does not work when a single thing provided for is quite different from another thing omitted. The canon "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). The role of a special master as envisaged by Federal Rule of Civil Procedure 53 and the PLRA is sufficiently distinct from that of a receiver appointed under the pre-existing inherent authority of a court so that Congress's treatment of one without the other does not imply a prohibition against receivers. Instead, "the better inference is that what we face here is nothing more than a case unprovided for." *Barnhart*, 537 U.S. at 169. We also note that, even if *expressio unius* did apply, the negative implication arguably drawn from it scarcely could qualify as "the clearest command" of Congress, *Yamasaki*, 442 U.S. at 705, or a "necessary and inescapable inference," *Warner Holding Co.*, 328 U.S. at 398, required to limit the traditional equity powers of the district court.

The State argues, however, that we should draw a prohibition against receivers from the general intent behind the

---

[2]Section 3626(g)(8) does include in the definition of "special master" a person appointed under the inherent authority of the court, but the inclusion is limited to persons appointed "to exercise the powers of a master." 18 U.S.C. § 3626(g)(8). The Receiver here was appointed to exercise quite different powers.

PLRA. There is no doubt that one of the purposes of the Act was to restrict severely the intrusion of the judiciary into the operation of prisons. *See Gilmore*, 220 F.3d at 996-97. Much of that goal was achieved by § 3626(a)(1)(A) of the Act, which provides that all prospective judicial relief (necessarily including the appointment of receivers) must be accompanied by findings that the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). We are not convinced, however, that Congress effectuated an intent to prohibit receivers when it wrote the provision governing special masters into the Act.[3]

   **[4]** There is little legislative history attending the final enactment of the PLRA because it was tacked onto an omnibus bill. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-34, § 802(a), 110 Stat. 1321, 1321-66. The PLRA had its origins in three bills earlier addressed by both chambers of Congress: the Violent Crime Control and Law Enforcement Improvement Act of 1995, S. 3, 104th Cong. § 103 (1995); the Stop Turning Out Prisoners Act ("STOP"), S. 400, 104th Cong. (1995), and the PLRA bill itself, S. 866, 104th Cong. (1995) (enacted). Another predecessor was considered by the House alone, the Violent Criminal Incarceration Act of 1995, H.R. 667, 104th Cong. (1995). The legislative history of these bills includes varying statements of intent to limit judicial management of prisons, but this general intent appears to have undergone considerable refinement as the bills were shaped into the enacted PLRA. For example, the Violent Criminal Incarceration bill included

---

   **[3]**It is clear, of course, that the PLRA does not *authorize* the appointment of receivers. As we have explained, federal courts have inherent power under their equity jurisdiction to appoint receivers, and do not need the PLRA to confer on the courts what they already have. The only issue presented here is whether the PLRA *prohibits* the appointment of receivers, a question that we answer in the negative.

a provision regulating special masters that applied to "any special master *or monitor*" and provided that such master or monitor, who had to be a magistrate judge, shall make proposed findings of fact on issues submitted by the court but that they "*shall have no other function*." *See, e.g.*, H.R. Rep. No. 104-21, at 6 (1995) (emphasis added).[4] The House Judiciary Committee Report on this bill stated that this broad language was intended to apply to all kinds of persons, including receivers, that might aid the court in enforcing judicial relief in a prison lawsuit. *Id.* at 27-28. But this expansive language was discarded before the PLRA was enacted. Monitors (or other court agents) were not included in the limitations applicable to special masters, and even special masters no longer had to be magistrate judges and they were not expressly limited to making recommended factual findings. "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russelloo v. United States*, 464 U.S. 16, 23-24 (1983). We conclude that § 3626(f) as finally enacted neither applies to receivers nor prohibits their use in implementing judicial relief in prison litigation.

We are supported in our reasoning and conclusion by *Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003), *abrogated in part on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70-72 (2d Cir. 2009). In that case, the Second Circuit was faced with the question whether the PLRA's provisions regarding special masters applied to a neutral organization, the Office of Compliance Consultants, appointed by the district court to monitor relief ordered by the district court for fourteen jails in New York City. *Id.* at 39. The Second Circuit noted that the functions of a monitor differed greatly from those of a special master, and concluded:

---

[4]The special-masters clause in the Senate version of STOP is identical. *See* S. 400; *see also* Local Law Enforcement Enhancement Act of 1995, S. 816, 104th Cong. (1995).

Nothing in the text of § 3626(f) expressly reveals Congress's intent either to treat all court-appointed agents as special masters or to prohibit a court from appointing agents to perform functions that differ from the quasi-judicial activities of special masters. Indeed, to the extent the PLRA's definition of "special master" is not entirely circular, by limiting its reference to court-appointed agents to those performing the duties of a master, the Act, we believe, implicitly incorporates the long-recognized principle that Article III courts may appoint agents to engage in a variety of activities essential to the performance of judicial responsibilities.

*Id.* at 45-46. Relying as well on the deletion of the reference to "monitors" in predecessor bills, the Second Circuit concluded that the court's inherent power to appoint and employ monitors was unaffected by § 3626(f). *Id.* at 46-47.

**[5]** For parallel reasons, we conclude that the special master provisions of § 3626 neither apply to nor prohibit the district court's appointment of a receiver in the present litigation.

## B. The District Court Did Not Err in Finding That the Receivership Was the Least Intrusive Means of Remedying the Constitutional Violation.

The State next contends that the district court was required to terminate the receivership because, when it initially imposed the receivership, it failed to meet the following requirements of § 3626(a)(1)(A):

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn,

> extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). The State complains that the district court ran afoul of this provision when it failed to appoint a special master and proceeded to the more drastic remedy of appointing a receiver.

At the outset, we are compelled to point out that, as a matter of equity, if not estoppel, the State is in a poor position to assert this objection to the receivership. The receivership was imposed only after the State admitted its inability to comply with consent orders intended to remedy the constitutional violations in its prisons. After a hearing on the court's order requiring the State to show cause why it should not be held in contempt, the district court issued findings and conclusions establishing the need for further measures to remedy gross constitutional violations, and held the contempt proceeding in abeyance while a receivership was imposed. The State acknowledged without reservation the court's authority to appoint a receiver. That was in 2005. The district court appointed the Receiver the following year, and the State took no appeal. Since that time—a period of more than three years —the State has unstintingly cooperated with the Receiver in his efforts to develop remedial plans and renovate existing medical facilities. And, as recently as November 2008, the appellant argued to the three-judge court in parallel proceedings in *Coleman v. Schwarzenegger*, *see supra* n.1, that the Receiver is the least intrusive means of remedying constitutional violations in the provision of medical services to California's prisoners. (S.E.R. 1369.)

**[6]** Be that as it may, the record simply does not support the State's contention that anything less than a receivership would have remedied the undisputed constitutional deficiencies in prisoners' health care at the time the receivership was

imposed. The State stipulated to two orders intended to remedy the deficiencies and it later confessed its inability to carry out those orders. The State never suggested how it could, through its own machinery, comply with those orders or otherwise rectify the constitutional deficiencies in its prison health care. The court imposed the receivership not because it wanted to, but because it had to. After attempting less drastic remedies, and after long periods of working closely with State authorities to try to bring them into compliance with the orders to which they had stipulated, the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future.

The State further argues that, whatever the situation at the time the receivership was imposed, the receivership no longer is the least intrusive means of remedying the constitutional violations. *See* 18 U.S.C. § 3626(b); *Morales Feliciano v. Rullan*, 378 F.3d 42, 52 (1st Cir. 2004). It is not at all clear that the State raised this issue in the district court. The question whether there are present constitutional violations is fact-intensive, *see Morales Feliciano*, 378 F.3d at 52-53, but the State opposed the Receiver's request for an evidentiary hearing and insisted that its Motion to Terminate raised only questions of law.

In any event, nothing in the record supports the State's contention regarding the current necessity for a receivership, and a great deal of evidence in the record contradicts it.[5] The State to this day has not pointed to any evidence that it could rem-

---

[5]The State contends that the district court improperly placed on the State the burden of proving that the receivership was not the least intrusive method of remedying the constitutional violations. We need not address that issue because, regardless of the burden of proof, overwhelming evidence in the record supports the district court's finding that termination of the receivership and appointment of a special master would not remedy the constitutional violations. *See Pierce v. County of Orange*, 526 F.3d 1190, 1206 & n.16 (9th Cir. 2008).

edy its constitutional violations in the absence of the receivership. The district court appointed the Receiver to stand in the stead of the Secretary of the CDCR. The State's motion to replace the Receiver with a special master contains no hint of how a special master, with the limited functions set by the PLRA, could remedy the violations. A special master is primarily useful for conducting hearings and making recommended findings of fact. The State has not raised any factual issues to be addressed in such hearings, and it has not asked for those hearings.

**[7]** At its most relevant, the PLRA permits a special master to assist in developing remedial plans. But there has been no shortage of remedial plans; the State admitted that it could not comply with two plans to which it had stipulated. Others have been developed by the Receiver. The problem has not been with a lack of plans, but with the State's inability to execute them. The district court did not err in ruling that a special master could not remedy the constitutional violations.

The State in its briefing has raised various complaints that the Receiver has taken unnecessary particular actions, or has made inappropriate expenditures, beyond those required to remedy constitutional violations. These individual complaints, however, do not address the legality or propriety of the receivership as the least intrusive means of remedying constitutional violations. Whether the Receiver has violated instructions or gone beyond his mandate in any given instance— allegations that the Receiver denies—is a matter that must be addressed to the district court, and be resolved in an evidentiary hearing if necessary. The State successfully opposed an evidentiary hearing in the district court. It cannot now, on appeal, make use of its untested allegations in challenging the legality of the receivership.

**[8]** We therefore reject the State's challenge to the receivership. We conclude that the record amply supports the district court's initial findings that the relief of a receivership

was narrowly drawn, extended no further than necessary to correct the constitutional violations, and was the least intrusive means to correct them. The record also supports the court's determination that nothing has cast doubt on the continuing validity of these findings. There has been no violation of §§ 3626(a)(1)(A) or 3626(b). We accordingly affirm the district court's denial of the State's motion to terminate the receivership and appoint a special master.

### C. The State's Challenge to the District Court's Refusal to Terminate the Receiver's Construction Plan is Not Appealable.

In the district court, the State moved to terminate the Receiver's construction plan, asserting that the plan to construct 10,000 health care beds at a cost of $8 billion went well beyond what was needed to cure the constitutional violations and lacked the necessary § 3626(a)(1)(A) findings by the district court. The district court rejected the motion in part because the Receiver's plan had been superseded, and present plans were still under consideration and in flux, rendering the challenge premature.

On appeal, the State has shifted its ground somewhat and argues that the Receiver has no power to engage in planning for the construction of prison facilities, and that this purported exercise of power must be terminated. The reason, according to the State, is that the PLRA deprives the district court and its Receiver of the power to order prison construction. To the extent that this argument was presented to the district court, that court found no need to address it because it had authorized no construction other than renovations to which the State had not objected.

**[9]** Whichever form of argument the State now pursues on appeal, we conclude that we have no jurisdiction to entertain it. The district court's ruling rejecting the challenge to the Receiver's particular construction plan is not a final judg-

ment; the plan itself was in flux and, as the district court stated, the challenge was premature. More important, the ruling did not end the litigation. We therefore have no jurisdiction to review the district court's ruling as a final judgment under 28 U.S.C. § 1291.

**[10]** We also have no jurisdiction over the district court's order refusing to terminate the construction plan under § 1292(a)(2), which permits interlocutory appeals of orders "appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof." *Id.* § 1292(a)(2). That statute clearly gave us authority over the district court's refusal to terminate (i.e., "wind up") the receivership. But the district court's refusal to block the Receiver's construction plan (or to deny the Receiver the power to plan, as the State now presents it) is not a refusal to terminate the receivership, nor is it a refusal to take a step to accomplish the winding up of the receivership. *See SEC v. Am. Principals Holdings, Inc.*, 817 F.2d 1349, 1350-51 (9th Cir. 1987) (interpreting § 1292(a)(2)'s "take steps to accomplish the purposes thereof" to apply only to orders refusing to take steps to wind up a receivership). The State's motion to terminate construction planning clearly was not intended as a step toward termination of the receivership; if its motion to terminate the receivership were granted, no such "step" as limiting the Receiver's power would have been necessary or useful. Instead, the motion to terminate the construction plan was an alternative to limit the Receiver's power in the event that the receivership were to continue. The district court's denial of the motion therefore is not a refusal to take a step to accomplish the winding up of the receivership, and we lack jurisdiction over the appeal under § 1292(a)(2).

**[11]** Thus, the order denying the motion to terminate the Receiver's construction plan (whether or not based on a denial of power to plan) is simply one more event in the administration of the receivership that is not appealable prior to a final judgment. It does not gain appealability by being

joined to the appeal of an order over which we do have statutory jurisdiction. *See Morales Feliciano*, 378 F.3d at 48 & n.3. We accordingly dismiss the appeal of the portion of the district court's order refusing to terminate the Receiver's construction plan.

## IV. Conclusion

The portion of the district court's order denying the motion to terminate the receivership is affirmed. The appeal from the portion of the district court's order denying termination of the Receiver's construction plan is dismissed.

**AFFIRMED in part, DISMISSED in part.**